# Bates v. Commonwealth.

Oct. 4, 1940.

J. S. Forester, Judge.

.2

G. G. Rawlings for appellant.

Hubert Meredith, Attorney General, Wm. F. Neill, Assistant Attorney General, Rodes K. Myers, Daniel Boone Smith and C. B. Spicer for appellee.

OPINION OF THE COURT BY SIMS, COMMISSIONER—Affirming.

The defendant, Emaline Bates, was indicted by the Grand Jury of the Harlan Circuit Court charging her with the wilful murder of Victoria Gross by striking and wounding her upon her head and body with a hard instrument, the exact description of which was unknown to the Grand Jury. The trial resulted in a conviction of murder, the punishment was fixed at confinement in the penitentiary for life and she now seeks to reverse the judgment because: 1. No corpus delicti was proven; 2. there was only circumstantial evidence against her and as that was as consistent with innocence as of guilt, she was entitled to a peremptory instruction; 3. incompetent evidence was introduced against her; 4. the court erred in failing to define a deadly weapon in the instructions and in not instructing on involuntary manslaughter. A proper consideration of the errors assigned requires a brief resumé of the evidence.

The deceased, Mrs. Gross, operated a boarding house on Cumberland Avenue in the City of Harlan. The house was a large one containing thirteen rooms, six downstairs and seven upstairs, with the steps going up from the living room. There was a bath on each floor, with the upstair's bath, which contained no window, located near the top of the steps. Mrs. Gross was afflicted with high blood pressure, and defendant had been employed to do the cooking and general house work about a month before the tragedy, which occurred around 9 o'clock Tuesday morning, August 8, 1939.

On this morning Jack Gross, whose age is not shown by the record, and his eighteen year old sister, June, were downstairs and heard some muffled screams and ran to the upstairs bath. They found the door closed with some person's weight against it, and upon asking if their mother was in the bath, they heard the light switch snap off and heard running water; the door opened slightly and defendant told them, "No, she has gone to town," at which instant before she slammed the door shut they saw defendant's face and her hand, the latter had some blood on it. These young people then returned downstairs; Jack heard someone tiptoeing back and forth from the bathroom to the back end of the hall. In a few minutes defendant came down and asked June: "Did you see that man who was looking for your mother?", to which she replied: "No, there wasn't any man here." Defendant then requested Jack and June to go to the grocery for her. They refused and June went next door and got Mrs. Nolan.

Mrs. Nolan found Mrs. Gross in the upstairs bathroom clothed and lying in the tub perfectly still and she immediately summoned help. Tom Jones, a policeman, Dr. Nolan and Mayor Smith went to the scene in a few minutes where they found Mrs. Gross dead, lying in the bath tub on her back with her feet hanging over the foot of the tub. Her glasses, false teeth, and a breast pin, the latter identified as defendant's were found under her. There were some bruises on Mrs. Gross' body and forehead, all of which were of minor character. Two towels found under the head of the tub were saturated with blood and three towels at the foot of the tub had quite a bit of blood on them and there was some lint, similar to that which sheds from bath towels, about her mouth and some blood stains on the wall around the light switch. A strong odor of Lysol was in this small bathroom and considerable Lysol was about Mrs. Gross' mouth and on her neck, but the doctor's examination showed none had entered her mouth. Dr. Nolan testified this blood came from her nose or mouth and that a severe blow on the top of the head would cause bleeding of the mouth or nose. When asked what caused her death, the doctor merely replied: "Well, it was not Lysol." The undertaker, Mory, who prepared the body for burial is a graduate embalmer with seven and a half years' experience who testified his course in embalming included some study of anatomy, and that he had em-

balmed many bodies where death resulted from traumatic injury. He described a flat indentation, large enough to lay the tip of the finger in, which was some two inches over the right ear, and in his judgment, was possibly sufficient to cause death. No autopsy was made and it does not appear this wound was discovered by Dr. Nolan, at least he did not mention it in testifying.

Hobert Parsons, a boarder, testified when defendant called him for breakfast around seven o'clock on the morning of the tragedy, she was wearing a green dress and on it was the pin later found under deceased in the bath tub; that after the body was found the defendant was wearing a different dress. The officers found this green dress in an upstairs room, two or three doors back from the bathroom, rolled up under some bed clothes and it had blood splotches on it. In the same room was found defendant's purse and an empty Lysol bottle with wet Lysol on the side of it. In the purse was a bill of sale for certain of the boarding house furniture and fixtures signed "Gross," which defendant testified she and Mrs. Gross had prepared and the latter had signed; but two daughters of Mrs. Gross testified this was not their mother's writing. In a downstairs room which deceased and defendant occupied jointly as a bedroom the officers found a .38 caliber "squeezer" pistol. It had water on it and was found under the cover near the head of defendant's bed where she was sitting at the time. This pistol had five cartridges in it, two of which had been snapped but had not fired. At the time it was found, defendant said this pistol belonged to a man working at the Green Motor Company. Officer Jones and Merle Middleton found these articles in the house just following the discovery of Mrs. Gross' body. When this green dress was put on defendant, it fitted her and there was a place on the dress showing where the pin found in the bath tub had been worn. This dress was put on her an hour or so following the finding of the body, and defendant then denied owning it, saying she knew nothing about this dress. However, she testified on the trial that she formerly owned this dress but had given it to Mrs. Gross soon after being employed by her.

The defendant testified that she was not upstairs after calling Parsons to breakfast and had no connection with Mrs. Gross' death. She further testified that Mrs. Gross and Jack Dalton, a former boarder, had a

row at the boarding house on Sunday preceding the fatal Tuesday; that Mrs. Gross had threatened to kill him with this pistol and had fired two shots at him that Sunday, and when he left she gave the pistol to defendant to keep for her. She further testified that Dalton came to the house on Tuesday morning while Mrs. Gross was out and after she returned he requested defendant to tell her to come upstairs, which word she delivered, but did not know whether or not Mrs. Gross went upstairs. Nobody saw Dalton at the boarding house on this Tuesday morning except defendant, nor did she or anybody else see him leave, although Jack and June Gross were in the living room on the first floor from which the stairs ascended. It is difficult to believe from this record that Dalton was in the house on the day the body was found. Lorraine Gross, another daughter of deceased, denied there was any trouble between her mother and Dalton on Sunday or that any shots were fired.

Dr. Clark Bailey was the only other witness who testified for defendant. His testimony was to the effect that on October 3, 1936, Mrs. Gross' blood pressure was around 200; that she had a severe hemorrhage from the nose on that day and lost between a pint and quart of blood; thereafter on October 19, 1936, her blood pressure dropped to 130. He gave her blood pressure as of various dates and testified that on July 28, 1939, it was 185; that if a person died from high blood pressure, death would occur from a paralytic stroke, due to a rupture of a blood vessel on the brain.

We cannot agree with defendant that the Commonwealth failed to establish the corpus delicti. In establishing such the burden was on the Commonwealth to prove not only the death of Mrs. Gross, but that it was the result of criminal acts by the defendant. Com. v. Inman, 225 Ky. 667, 9 S. W. (2d) 1000; Powell v. Com., 276 Ky. 234, 123 S. W. (2d) 279. Both the death and the criminal agency on the part of the defendant were amply proven by the testimony just detailed.

Defendant argues that the evidence against her was circumstantial and it was not sufficient to take the case to the jury or to sustain a conviction, since it is as consistent with her innocence as with her guilt. The rule is that a conviction may be had upon circumstantial evidence alone where it may not be reconciled with the pre-

sumption of innocence and excludes every reasonable hypothesis of defendant's innocence, Moore v. Com., 223 Ky. 128, 3 S. W. (2d) 190; Baird v. Com., 241 Ky. 795, 45 S. W. (2d) 466; Couch v. Com., 255 Ky. 729, 75 S. W. (2d) 360. Here, the evidence considered as a whole unerringly points to defendant as the perpetrator of this crime. It is irreconcilable with her innocence and is calculated to have induced the jury to believe beyond a reasonable doubt that she committed the criminal act with which she was charged.

It is contended by the defendant that the court erred in permitting the attorneys representing the Commonwealth in examining witnesses to refer to the fact that Mrs. Gross was killed, rather than that she was found dead. In some instances the court sustained objections to such questions, in others he did not rule on them, and in still other instances, such objections were overruled. While it was not proper for counsel representing the Commonwealth to so frame their questions in a case of this character as to assume that Mrs. Gross was killed, yet this could not have been prejudicial to defendant's substantial rights as we notice counsel for defendant in interrogating their own client, asked her questions in this same form. Objections were further made to witnesses of the Commonwealth testifying that the cuticle around defendant's nails appeared to be discolored by blood. As she admitted her finger was bleeding, claiming it was the result of being mashed when she accidentally struck it with a hammer that morning, and as she admitted getting blood on her hands while dressing a chicken, such testimony was not prejudicial to her. However, we might add no evidence could be found that she dressed a chicken that morning, and the head of the nail she is alleged to have driven had varnish on it and was covered with dust. Numerous other exceptions were taken to the rulings of the court on the admissibility of evidence, but as they have no more merit than those just mentioned we will not consume time and space in discussing them.

The instructions were not erroneous in failing to define a deadly weapon. Landrum v. Com., 266 Ky. 655, 99 S. W. (2d) 787. This very question was before the court in Payne v. Com., 255 Ky. 533, 75 S. W. (2d) 14, 19, and it was there written:

"If death results, and if the act producing it is

willfully and maliciously committed, it is wholly immaterial whether the implements used, which produced death, were deadly weapons or not; the crime is murder.

"The court properly failed to define the words 'blunt instrument,' as they are used in the indictment and the instruction."

But defendant argues that where it is doubtful as to what character of instrument was used to cause death there should be an exception made to the rule enunciated in the Payne and Landrum cases, and that the court should define a deadly weapon. We are unable to see the logic, if any there be, in such an argument. As the law does not require the instructions to define a deadly weapon where the instrument of death is known, there is no reason why it should require such a definition merely because the exact character of the death dealing instrument is unknown.

The instructions covered murder, voluntary manslaughter and self-defense and were in due form. However, defendant insists that as this was a case where there were no eye witnesses and as defendant relied upon an alibi, and as there was evidence of a struggle at the time of the homicide, it was the duty of the trial judge to instruct on every phase or degree of the crime that might possibly apply, so that the jury could return a verdict under any state of fact it might believe to be consistent with the evidence. There can be no doubt but that this is the correct rule, Roberson's Criminal Law (2d Edition) 1987, Section 1872; Frasure v. Com., 169 Ky. 620, 185 S. W. 146, and cases therein cited; Fletcher v. Com., 239 Ky. 506, 39 S. W. (2d) 972. In the instant case the evidence plainly shows there was a struggle as deceased's glasses and false teeth were under her as was a pin identified as coming from defendant's dress; also, there was hair found in the hand of deceased which was similar to defendant's hair.

There is no escape from the fact that the court failed to give the whole law of the case when the involuntary manslaughter instruction was omitted, since the jury reasonably might have found from the evidence that defendant without malice did unlawfully and wilfully assault deceased with no intention of killing her

but that such assault did result in her death. But the question arises, was the omission of the involuntary manslaughter instruction prejudicial to the substantial rights of defendant in this instance where she was convicted of murder? If not, the omission is not reversible error, Section 340, Criminal Code of Practice.

Under the first instruction the jury could convict defendant of murder and fix her punishment at death or confinement in the penitentiary for life if they believed from the evidence beyond a reasonable doubt she killed deceased wilfully and with malice aforethought. While under the second instruction the jury could convict her of voluntary manslaughter if they believed the killing was done by the defendant, not with previous malice, but in sudden affray or in sudden heat of passion and could fix her punishment at confinement in the penitentiary for not less than two and not more than twenty-one years. With these two instructions before it and with the further instruction that if they had a reasonable doubt as to the degree of the offense of which defendant had been proven guilty, they should convict of the lower, the jury found the killing was done with malice aforethought and not in sudden heat of passion and fixed defendant's punishment at life imprisonment in the penitentiary. Then, can it reasonably be argued that where the jury found the defendant guilty of murder rather than of voluntary manslaughter, it would have considered an instruction on involuntary manslaughter that the killing was not only without malice and not done in sudden affray or sudden heat of passion, but was the result of assault with no intention upon the part of defendant to kill deceased? Here the jury discarded the voluntary manslaughter instruction and convicted the defendant under the murder instruction and must have considered all the facts for the purpose of mitigating the punishment, therefore, it is inconceivable that had an instruction been given on involuntary manslaughter, the jury might have found her guilty under such an instruction. The jury having weighed the facts, convicted the defendant of first degree rather than second degree homicide, and it is illogical to think it would have convicted her of third degree homicide had the involuntary manslaughter instruction been given. Roberson's Criminal Law (2d Edition) 720, section 525; Spriggs v. Com., 113 Ky. 724, 68 S. W.

1087, 24 Ky. Law Rep. 540; Lee v. Com., 10 Ky. Op. 489. In Mitchell v. Com., 78 Ky. 219, it was written:

> "The instructions given by the court are substantially correct, and the failure of the court to instruct as to the law of involuntary manslaughter was not prejudicial to appellant. The court had already instructed as to the law of voluntary manslaughter—intentional killing without malice—and as the jury found the killing to have been done with malice, the instruction as to involuntary manslaughter could not have been of any service to appellant."

We conclude defendant's substantial rights were not prejudiced by the court's error in failing to instruct on involuntary manslaughter, hence such failure was not reversible error under Section 340, Criminal Code of Practice. Judgment affirmed.