**George Thomas HENDERSON, Appellant,**

**v.**

**COMMONWEALTH of Kentucky, Appellee.**

Court of Appeals of Kentucky.

March 22, 1974.

Terrence R. Fitzgerald, Deputy Public Defender, Louisville, for appellant.

Ed W. Hancock, Atty. Gen., Patrick B. Kimberlin, III, Asst. Atty. Gen., Frankfort, for appellee.

PALMORE, Justice.

George Thomas Henderson appeals from a judgment sentencing him to life imprisonment pursuant to the verdict of a jury finding him guilty of murder. KRS 435.-010. For the reasons hereinafter stated, we have reached the conclusion that the conviction must be reversed for a new trial.

Around midnight of December 19–20, 1972, Mrs. Mary Evelyn Wilson was killed in her home on Preston Street in Louisville. Her death resulted from several blows on the head, evidently inflicted by a hammer.

As best we can make out from the evidence, the house in which Mrs. Wilson lived consisted of two or more floors and was shared by her own immediate family and the families of two married daughters.

Mrs. Wilson and her young son Robert occupied an upstairs bedroom which was connected to a bathroom by a short hallway. The bathroom opened on its other side into a small storage room. Both the bedroom and the small storage room had doors opening to an outer hallway, so that a person could enter the bedroom from the outer hall and return to the hall through the bathroom and storage room, or vice versa.

The appellant and Mrs. Wilson were acquainted, and on at least one occasion before the night in question he and some other people had come to her place and they had all gone out together.

At approximately 11:00 P.M. on December 19, 1972, Henderson went to see Mrs. Wilson for the purpose, he says, of asking about a couch she had offered to give him. Her son Robert, 13 years of age, was in the storage room building a bird cage. According to his testimony Henderson wanted her to cash two checks for him, which she declined to do, and after a short time he left. An hour or so later Robert was downstairs, and as he returned upstairs with his nephew David Doyle, also 13 years of age, he discovered a man, naked above the waist, going through the dresser drawers in the bedroom. At first David thought that the intruder might be Mrs. Wilson's husband, who is said to have been sleeping in a back room, but then he was more clearly seen and was later identified by the boys as Henderson (whom they had not known before that night). They saw him run down the stairs and out of the house. Shortly thereafter Mrs. Wilson's dead body was found submerged under hot water in the bath tub and covered over with clothing, soap cartons, a pocketbook and other miscellaneous articles. The head and handle of a claw hammer were lying separately on the floor nearby. Among the items of evidence gathered in the bathroom was Henderson's sport jacket, in which his billfold and two forged checks were found. One of his fingerprints was lifted from a telephone in the bedroom.

Henderson, 35 years of age, lived part of the time over a bar in which he was employed and part of the time in the home of a friend named Shelton. At approximately 2:00 A.M. of December 20, 1972, he came to Shelton's place, washed his trousers and a pair of socks in the bathtub, paid Shelton a $10 debt, and departed. Traces of blood were later found in one of the socks and in a towel taken by investigating officers from Shelton's bathroom.

Testifying in his own behalf, Henderson claimed that he had been to Mrs. Wilson's house only once during the night in question and that the visit had lasted some 20 minutes, during which time she gave him one drink of whiskey and he pawned his coat (with the billfold and forged checks in it) to her for $10. He denied having asked her to let him have any money for the checks. He denied also having touched the telephone. His explanation of the blood later found in his clothing was that he had been in a barroom fight some days before in which a girl had cut her hand on a glass. His sleeping room over the bar at which he worked did not have any facilities for washing his clothes. He denied having had any unpleasantness with or done any harm to Mrs. Wilson.

Those are the bare outlines of the case. Further details will be mentioned as they appear pertinent to the questions raised on the appeal, which are as follows:

1. The trial court refused to instruct on voluntary manslaughter as a lesser degree embraced within the charge of murder.

In order to require or to authorize an instruction on voluntary manslaughter the evidence must justify an inference that the killing resulted either from a sudden affray or from sudden heat of passion induced by reasonable provocation. In a murder case, evidence of intoxication calls for a voluntary manslaughter instruction if, but only if, it would justify a reasonable doubt on the part of the jury that at the time of the offense the defend-

ant had the capacity "of appreciating the nature or quality of his acts and . . . the ability to entertain. malice or criminal intent. In other words, it must amount virtually to insanity." Hall v. Commonwealth, 258 Ky. 744, 81 S.W.2d 404 (1935). There being no evidence, direct or circumstantial, of such a degree of intoxication in this instance, drunkenness alone as a possible basis for a voluntary manslaughter instruction may be dismissed from further consideration. Mere drinking, several beers, or even obvious drunkenness is not enough. Cf. DeBerry v. Commonwealth, Ky., 289 S.W.2d 495, 497 (1956); Caine v. Commonwealth, Ky., 491 S.W.2d 824, 832 (1973).

Mrs. Wilson was discovered by her daughter Virginia Doyle (David's mother) and another daughter who removed her from the tub and placed her body on the bathroom floor. In the process, of course, they took some of the debris out of the tub, but there is no evidence that the condition of the premises was otherwise disturbed before the arrival of the police shortly thereafter. Both the bathroom and bedroom were in a state of considerable disarray. Newspapers, magazines, towels, and a washcloth strewn about the floor were all bloodstained, as were some of the exposed waterpipes under and near the washbowl. Mrs. Wilson's head was covered with blood, and some of that had spread onto the floor. She was nude except for one leg of the slacks she had been wearing. One of her shoes was under the edge of the tub and the other lay three or four feet away at the foot of a washing machine. And as we have said before, Henderson's coat and the head and handle of a claw hammer also were found on the bathroom floor. The hammer parts showed bloodstains. Henderson's coat was found beside a pillow slip into which several articles such as a clock-radio and a tape recorder had been stuffed.

As described by investigating officers, "The bathroom was in disarray. *It showed of a struggle* . . . There was blood splattered on the wall and also on the wall beside the victim." (Emphasis added.)

Except for the bloodstains and body, the bedroom was in much the same state as the bathroom. Apparently numerous articles of clothing had been taken from a chest of drawers and thrown about the room. The doors of a metal storage cabinet standing next to the head of the bed had been pried apart at the top, and a small metal money box Mrs. Wilson had kept in this cabinet lay open and empty on the bed.[1] The cabinet had been secured by a padlock and short chain threaded through the door handles and, oddly enough, the key was in the lock.

"It is fundamental that, if there is *any evidence tending* to show that a homicide is manslaughter, the accused is entitled to an instruction upon that hypothesis." (Emphasis added.) Shorter v. Commonwealth, 252 Ky. 472, 67 S.W.2d 695, 696 (1934). "Ordinarily, where no eyewitness testifies, the court should instruct as to murder, manslaughter and self-defense." Thorpe v. Commonwealth, 301 Ky. 541, 191 S.W.2d 572, 573 (1946).

Though it seems likely that the assault on Mrs. Wilson emanated solely from a quest for money and that much of the disarray occurred afterward, it can scarcely be denied that there was evidence tending to show an affray. There was even less evidence of a struggle in Sewell v. Commonwealth, 284 Ky. 183, 144 S.W.2d 223 (1940), and in Stanley v. Commonwealth, Ky., 380 S.W.2d 71 (1964), yet a manslaughter instruction or instructions were required in both. In the absence of testimony by any person purporting to have been an eyewitness, we cannot avoid concluding that Henderson was entitled at least to an instruction on voluntary manslaughter.

In Salisbury v. Commonwealth, Ky., 417 S.W.2d 244, 247 (1967), cited by the Com-

---

1. Mrs. Doyle testified that her mother had several hundred dollars in the money box.

monwealth, the killing was accomplished "in one swift, violent act," 417 S.W.2d at p. 246, and in the presence of an eyewitness. There was no evidence of an affray and no evidence of sufficient provocation to ground a theory of sudden heat of passion. Hence it was held that no instruction on manslaughter was required. That case is clearly distinguishable from this.

2. The trial court declined to instruct on insanity and would not permit access to certain information at the disposal of the state probation and parole authorities.

A week before the trial Henderson, through counsel, presented a motion stating that he had been consulting with psychiatric experts with regard to a defense of insanity and that the Commissioner of Corrections and his subordinate personnel were in possession of information concerning his past conduct which the consulting psychiatrists needed in order to assess his mental condition, but these officers of the state had refused to divulge the information on the ground that it was privileged by virtue of KRS 439.510. The motion sought an order requiring disclosure. It was denied.

On the day of the trial an appropriate officer of the Division of Probation and Parole appeared in response to a subpoena duces tecum issued at the instance of Henderson's counsel, and the motion for disclosure was renewed but again denied. Counsel then moved that he be permitted to question the parole officer by way of avowal as to his personal knowledge of Henderson's history. Consistent with its ruling with regard to the documentary evidence, the trial court also declined to permit any questioning of the officer.

KRS 439.510 provides as follows:

"All information obtained in the discharge of official duty by any probation, parole or conditional release officer shall be privileged and shall not be received as evidence in any court. Such information shall not be disclosed directly or indirect-

ly to any person other than the court, board, department or others entitled under KRS 439.250 to 439.560 to receive such information, unless otherwise ordered by such court, board or department."

As we understand it, the statute (1) categorically prohibits without exception the use of this information as evidence and (2) prohibits its disclosure by order of any court other than one in which a proceeding giving rise to the probation and parole function was had or is pending. Obviously the legislature intended the use of such information to be confined to the purposes of probation and parole. In the absence of some constitutional invasion or limitation of which we are unaware, there does not appear to be any legal reason why the legislature may not so provide. The wisdom of the statute, of course, is not for the courts to question. Although the trial court in this case may have had the discretion to order a disclosure, since the object for which the information was presently being sought was not related to the purposes of probation and parole we are of the opinion that it was not an abuse of discretion to deny it.

The evidence bearing on the question of whether an instruction on insanity should have been given consisted mainly of lay proof that Henderson from time to time behaves in a very bizarre manner and the opinion of an examining psychiatrist that he is a "borderline mental retardate" and that "his capacity to understand the consequences of his action at the time of alleged offense . . . remains questionable."

If the burden of proof on the issue of sanity were on the Commonwealth, we might very well hold that the psychiatrist's opinion was enough to found a reasonable doubt and that the instruction should have been given. As it is, however, in this jurisdiction the burden is on the defendant. Roberson, New Kentucky Criminal Law and Procedure, § 56; Tunget v. Commonwealth, 303 Ky. 34, 198 S.W.2d

785, 788 (1947). Aside from the fact that the expert would characterize Henderson's capacity to understand the consequences of his act as no more than "questionable," there was a basic deficiency in the failure of any witness to relate his mental capacity to the legal criterion of insanity as set forth in Terry v. Commonwealth, Ky., 371 S.W.2d 862, 865 (1963). Not only must a defect or disease be shown, but also there must be evidence from which the jury might reasonably conclude that as a result the defendant was substantially unable to understand that he was violating the law or, even though he may have had such an understanding, his capacity to conform his conduct to the requirements of the law was substantially below the normal self-control of mankind in general. The proof in this case was simply not enough to warrant an instruction on the defense of mental incapacity.

3. The trial court denied Henderson's motion for an in-chambers hearing on the admissibility of testimony relating statements made by him to the police following his arrest, and the evidence was admitted over his objection.

Henderson was arrested around noon of December 20, 1972, by Detective Frank Boyer of the Homicide Division, and shortly thereafter was interviewed and given a polygraph test at police headquarters. According to Officer Boyer, the statements made by Henderson to him were as follows:

"I asked him if he would tell me what happened at Mrs. Wilson's house on the evening of December 19, the evening preceding this time and early that morning. He then stated that he had been to Mrs. Wilson's house and that he had gone there to cash two checks. He stated that at this time Mrs. Wilson had refused to cash the checks and that she was angry and upset with Mr. Winston Stotts who was Henderson's boss at the tavern where he worked part time. This was over one hundred dollars that Mr. Stotts had owed her. At this time he stated that she refused to cash the checks and he left. He stated that he came back to the house later and upon going to Mrs. Wilson's room, he was met there by a big fat man with a pot belly and that this man was in the room. He stated that he then found Mrs. Wilson stuffed in a corner underneath the wash basin in the bathroom, and at this time she had a stick or something in her hand. He stated that he walked over to her and she had a blood clot in her nose, and he at this time told her that he would help her. He stated that he then picked her up and placed her on the side of the tub and started running water on her. He said at this time there was a knock on the door and I got scared and I ran out into the other room, and he saw a boy that was wearing glasses. He says that he then ran back in the room and then opened the door and ran out of the house. This is all that he would tell me at this time. At this time I observed Mr. Henderson and on his right forearm on the under side in this area was three small scratches, on the top side of his right arm was one small scratch and there was one small scratch on the back of his left hand. These were all very minor scratches. No way of knowing whether they were old or new or anything, but there were three scratches, one on the top and one on his hand."

Q—"Did he explain to you why he had left the house without his coat and without his shirt?"

A—"No, sir. He didn't say anything to me about his coat or his shirt or what he had on or anything else. He didn't explain to me anything about going to Mr. Shelton's house or anything."

Q—"Did you ask him about his visit to Mr. Shelton's house?"

A—"Yes, sir, but at this time he just quit talking to me."

Q—"I see. As soon as you got that far, he quit talking?"

A—"Yes, sir. At that time he was booked and taken to the booking clerk."

It was developed through cross-examination that just before Henderson's interview with Officer Boyer he had been interviewed and given the polygraph test by Officer Gillingham of the Kentucky State Police. Gillingham did not testify, and the polygraph report was admitted only by way of avowal. Counsel for Henderson moved to suppress Boyer's testimony relating Henderson's statements on the ground that they were involuntary and had been first obtained from him incident to the polygraph test. He wished to show this either through examining Gillingham himself or through introducing that portion of the polygraph report in which the following conclusion was reached:

"The subject was not a capable reactor, probably due to excess drinking the night before. After careful analysis of the polygrams, it is the opinion of the examiner that this subject test is inconclusive."

The court declined to permit any part of the report to be introduced or to let the entire report be read with an admonition for the jury to consider it solely for the purpose of determining Henderson's state of mind at the time the statements were made.

It was, of course, a flat error for the trial court to ignore the procedural requirements outlined in Bradley v. Commonwealth, Ky., 439 S.W.2d 61, 63–64 (1969). Nevertheless, in order to justify setting aside a judgment an error must be (1) prejudicial and (2) preserved for review. When the trial court declines to admit certain testimony there is no way to tell whether it would have helped or hurt

unless it is put in and preserved as an avowal. Unquestionably the polygraph report itself was inadmissible, but there was no reason Gillingham could not have testified in person on the limited subject of Henderson's mental capacity and state of mind at the time of his interview. There having been no attempt to develop such testimony by avowal, we do not know what the man would have said, and therefore cannot make the threshold determination of prejudice.[2]

4. A series of 17 photographs (including six of the victim's body) showing the general state of disarray were admitted over objection on the ground that they were inflammatory.

Salisbury v. Commonwealth, Ky., 417 S.W.2d 244, 246 (1967), marked a change in course with respect to the inadmissibility of photographs simply because they are gruesome. "If evidence is otherwise competent, the fact that it is heinous or repulsive will not make it incompetent." *Ibid.* See also Napier v. Commonwealth, Ky., 426 S.W.2d 121, 122–123 (1968); Garr v. Commonwealth, Ky., 463 S.W.2d 109, 114 (1971), and Moore v. Commonwealth, Ky., 489 S.W.2d 516, 518 (1972).

We have some misgivings about the first six of these exhibits, because the body had been moved before the photographs were taken and was further rearranged on the floor for purposes of the pictures. Certainly it would be improper to admit photographs of a scene that had been substantially rearranged after the occurrence of the event which is the subject of the inquiry, and although that was not the basis of the objection in this case it bears notice for the purposes of retrial. Under the circumstances, and in the absence of further evidence to the contrary, we conclude that the physical evidence had not been sufficiently changed or

2. There is, incidentally, nothing else in the record to suggest that Henderson was not sober and in full possession of his faculties at the time he was arrested and then interviewed

at the police station. His explanation of the statements made to the officers (portions of which he denied) was, "I just told them so I wanted to get out of there."

disturbed to invalidate the value and competence of the photographs. Insofar as the body was concerned, we think, the principal value of the photographs was to shed light on the question of whether a manslaughter instruction should have been given, and in that respect they did the defendant more good than harm.

5. Objections to admission of expert testimony with reference to the various blood samples and to Henderson's fingerprint, upon the ground that the integrity of the evidence in question had not been proved, were overruled.

The physical items of evidence collected by investigative officers at the scene of the homicide and at Shelton's house were marked by them for identification purposes and were then turned over to another officer named King who took them to the state police laboratory at Frankfort for analysis. King did not testify. Hence the integrity of the evidence from the time it was relinquished by the investigative officers until it reached the laboratory analyst was not proved. We think that surely it is unnecessary to delve into the literature of the law in order to document the point that this type of carelessness in the development of important evidence during the course of a trial simply will not do. We know it is tedious and time-consuming to trace the integrity of an exhibit; in fact, it is tedious and time-consuming to have a trial at all when we think we know the defendant is guilty anyway, but it is not half as bad a nuisance to do it right the first time as it is to go through the whole process a second time two years later.

■ Insofar as the blood samples and comparisons are concerned there was no prejudice, because all they finally proved was that the victim's blood and the blood found on the hammer head were both type A, and that there was blood in one of the defendant's socks and on the towel. It was

pretty much of a foregone conclusion that most if not all of the blood in the bathroom came from the victim, and Henderson cured the deficiency in the evidence with respect to the sock and towel by admitting that there may have been blood on his clothing when he washed it.[3] Cf. Howard v. Commonwealth, Ky., 447 S.W. 2d 611, 614 (1969); Bates v. Commonwealth, 284 Ky. 1, 143 S.W.2d 730, 732 (1940).

■ There was a similar deficiency in the evidence with respect to the fingerprints. The detective who received the prints from the officer who took them and then delivered them to the examining officer did not testify. Neither did the custodian of the master fingerprint files kept at the police headquarters. We do not really doubt the authenticity of any of this evidence, but in our system of justice a person on trial has the right to have it proved. Again, however, since Henderson took the stand and admitted that he had been in Mrs. Wilson's room we do not see how he could really have been prejudiced by evidence that one of his fingerprints was found there, even though he did deny that he had used the telephone.

We would not reverse upon this ground, but in the event of a new trial it would help to have the case tried properly.

■ 6. The Commonwealth was permitted over objection to elicit from Henderson through cross-examination that he forged the two checks found in his coat.

When evidence has a valid purpose otherwise, it is not inadmissible merely because it shows the commission of another crime or crimes. That is elementary. The evidence concerning these two checks was both important and relevant to shed light on Henderson's possible motive in killing Mrs. Wilson, if he did so. There was no error in admitting it.

3. We do not consider the question of whether the erroneous admission of evidence sufficiently damaging to influence a defendant's election

either to testify or to remain silent would, in the event he chooses to testify, violate his protection against self-incrimination.

It is apparent from the record that the trial of this case was hastily prepared and conducted. Except for the fact that Henderson did admit to the officers that he had made a second trip to Mrs. Wilson's apartment there might be some doubt that he actually did so. It would be of some importance to know (and of course Robert could have been asked) whether he had his coat or shirt[4] on when he left the first time. Where was he, with or without his coat and shirt, during the interim between the two visits? If he got the money, what did he do with it? Why would he have pried open the metal cabinet when the key was in the lock? It could very well be that this was done afterward by someone else in a quick and clumsy effort to create the appearance of theft as a motive. Where was the hammer kept, that it was so readily available for use by one who, presumably, was a relative stranger to the premises? Mrs. Wilson's husband, who was said to be sleeping in a back room and was one of the first to be summoned to the scene when her body was found, did not testify. How is he eliminated as a suspect or co-suspect? What was the source of Mrs. Wilson's money, and who knew it was there? And if Henderson used the telephone, was he acting in concert with someone else? Who owned the tape recorder found at the scene of the crime (which Henderson told Officer Gillingham he had pawned to Mrs. Wilson and had come back to redeem)?

All of these avenues of inquiry may have been explored to the satisfaction of the investigating authorities, but there does appear to be a good deal more to this case than meets the eye from the evidence produced in court. It is hard to believe that this simple-minded defendant, with no apparent record of previous violence, suddenly turned into a ferocious monster who beat a defenseless woman to death with a hammer for some money. He must have been either wild drunk, hopped up on narcotics, crazy, or some combination of the three. A jury really ought to have the whole story, whatever it is. After all, this is a murder case.

We reverse because the instructions did not cover the whole law of the case, with directions for a new trial.

OSBORNE, C. J., and JONES, MILLIKEN, REED and STEINFELD, JJ., concur.

STEPHENSON, J., dissented.

---

4. The shirt, if he had one, apparently was not found.