**Barrington L. MORTON, Appellant,**

v.

**COMMONWEALTH of Kentucky,
Appellee.**

**88–SC–753–MR.**

Supreme Court of Kentucky.

Aug. 29, 1991.

Rehearing Denied Nov. 21, 1991.

Rodney McDaniel, Marie Allison, Asst. Public Advocate, Dept. of Public Advocacy, Frankfort, for appellant.

Frederic J. Cowan, Atty. Gen., Elizabeth A. Myerscough, Asst. Atty. Gen., Crim. Appellate Div., Frankfort, for appellee.

LAMBERT, Justice.

Appellant was convicted of two counts of murder for the stabbing deaths of drug dealer Stacy Archie and her five-year-old son David Shavers. The Commonwealth sought the death penalty, but the jury recommended punishment of life imprisonment without parole for twenty-five years on each count. In the final judgment, the sentences were ordered to be served concurrently. This appeal is as a matter of right and the Court heard oral argument.

Appellant has not questioned the sufficiency of the evidence to sustain the conviction. It is unnecessary, therefore, to extensively state the facts of the case. In summary, however, it appears that appellant's motivation was robbery and the murder of the victims was in furtherance of this purpose. Additional facts will be presented as the issues are discussed.

Appellant first contends that his rights under the Sixth Amendment to the Constitution of the United States and Section 11 of the Constitution of Kentucky were violated when the trial court refused, after finding appellant to be indigent, to permit earlier retained counsel to continue representing him on a *pro bono* basis. Appellant also contends that the trial court violated KRS 31.110, *et. seq.*, when it determined that he, upon being declared indigent and entitled to benefit of the statute, was not entitled to be represented by *pro bono* counsel, but was limited to counsel provided by the District Public Defender's Office.

From the record it appears that appellant or his family paid attorney Jan Waddell the sum of $100 for representing him. Thereafter, appellant filed a motion in which he sought to be declared an indigent person. In his motion he stated he was "unable to provide any additional money for legal representation or to afford expert witnesses to testify in his behalf or to provide scientific tests to assist in his preparation of an adequate defense in order to assure that [he received] his constitutional due process right to a fair trial." The motion was supported by appellant's affidavit and the affidavit of attorney Waddell. Mr. Wad-

dell stated that he had received $100 as an attorney fee for representing appellant and that he was "willing to provide further legal representation of the defendant in this case PRO BONO or ... accept an appointment by the Court to represent said Defendant, Barrington Lee Morton." An order was entered wherein Mr. Waddell was relieved as counsel and the District Public Defender's Office was appointed to represent appellant. The benefits of KRS 31.100, *et seq.*, were provided.

■ Appellant contends, despite his motion and affidavit for indigency status, that he had a constitutional right to have Mr. Waddell continue as his attorney. This Court has repeatedly held that the constitutional right to counsel does not embrace a right to be represented by a particular attorney. *Henderson v. Commonwealth,* Ky., 636 S.W.2d 648 (1982), *Baker v. Commonwealth,* Ky.App., 574 S.W.2d 325 (1978), and *Hargrove v. Commonwealth,* Ky., 362 S.W.2d 37 (1962). We reiterate that proposition here.

In *Hargrove v. Commonwealth, supra,* we expressed the view that *Powell v. State of Alabama,* 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932), merely prohibited the government from refusing a defendant "the right to have a particular person to defend him, or reasonable opportunity to obtain the services of such an attorney." *Hargrove, supra,* at 40. We continued, "The expression 'counsel of one's own choice' does not mean that the court is required to appoint counsel selected by the accused; it means, rather, that the accused has a right of his own volition to hire or otherwise obtain counsel and then be represented by that counsel at the trial." *Id.* at 40. In *Morris v. Slappy,* 461 U.S. 1, 14, 103 S.Ct. 1610, 1617, 75 L.Ed.2d 610, 621 (1983), the Supreme Court rejected an expansive reading of the Sixth Amendment and ridiculed the notion that a defendant has a "right to a meaningful attorney-client relationship."

Appellant was not denied his right to counsel. Nor was he denied the right to be represented by Mr. Waddell. Mr. Waddell was relieved as counsel only after appellant sought and obtained indigency status. Appellant made a determination that the benefits provided by KRS 31.110 outweighed his desire to be represented by a particular attorney. Having made such a determination and having otherwise been afforded his Sixth Amendment and Section 11 rights, we find no constitutional violation.

■ A more difficult question is whether the trial court erred in its determination that a defendant who seeks and obtains the benefits of KRS 31.110(1)(b) may not be represented by retained counsel who declares his intention to continue on a *pro bono* basis. Appellant correctly observes that the statute contains no express prohibition against having the Commonwealth provide "the necessary services and facilities of representation" when the defendant has obtained his own counsel. Be this as it may, in our view, KRS 31.100, *et. seq.,* is a unified enactment which contemplates the necessity of a comprehensive determination whether a defendant qualifies for the benefits provided. For it to be determined that he does, he must be without the independent means to obtain counsel. The statute surely does not contemplate that a defendant would be indigent for purposes of KRS 31.110(1)(b), but still able to hire an attorney. If such were the case, rarely would any defendant step forward to pay investigative costs and other services necessary for his representation. Indeed, in KRS 31.100(3) "needy person" or "indigent person" is defined as "a person who at the time his need is determined is unable to provide for the payment of an attorney and all other necessary expenses of representation." Under this definition and the general tenor of the entire Act, inability to obtain counsel and inability to obtain necessary services must go hand-in-hand.

In an unusual case, however, it may be that an indigent defendant can obtain counsel which is truly *pro bono;* counsel who has neither sought nor obtained any fee or the promise thereof for legal services rendered or promised. In such a circumstance, the dual benefits provided by the Act would indeed be severed. The defendant would be indigent for purposes of

necessary services and facilities, but otherwise be able to provide his own counsel without cost to himself. When such a circumstance produces the severance between ability to obtain counsel and need for other necessary expenses, the statute may be interpreted to permit the trial court to grant indigency status for purposes of KRS 31.110(1)(b) only.

As earlier stated, appellant's original counsel, Mr. Waddell was paid only the sum of $100 and later signed an affidavit that he was willing to continue his representation of appellant *pro bono*. It has been suggested that this sum is so trifling as to be unworthy of consideration as any attorney fee. We recognize the modesty of this amount of money for defense of a double murder case in which the death penalty is sought. Nevertheless, the money was paid as an attorney fee and Mr. Waddell's services cannot be said to have been truly *pro bono*. This Court is not unmindful of the wide range of fees charged by different attorneys for the same or similar legal services. Rarely have we become involved in evaluating such services or the reasonableness of attorneys' fees, believing that in most cases private parties may freely contract with one another. If we held that $100 did not constitute a fee, the next question would be at what point does the fee paid cease to be merely token and become a bona fide fee which would disqualify the defendant from indigency status. Rather than impose on trial judges the unenviable task of evaluating the fee, an inquiry which would necessarily require consideration of the factors set forth in SCR 3.130 (Rule 1.5), the better approach is to flatly state that any fee paid is indeed bona fide and so long as the recipient of that fee continues as counsel, the defendant is disqualified from any indigency status. To do otherwise would invite defendants to impoverish themselves by payments to attorneys and have the Commonwealth pay all other costs.

We have considered appellant's argument that freely permitting partial *pro bono* representation would relieve the burden on the public defender system and his argument that the trial court could hold a hearing to determine whether a defendant "has rendered himself impecunious by an unreasonable expenditure of funds to retain private counsel." *English v. Missildine*, 311 N.W.2d 292, 294 (Iowa 1981). We have heretofore expressed our view as to the latter point and as to the former, we do not believe the financial burden on the Commonwealth would be relieved. In our view, permitting defendants to employ counsel and then claim indigency for purposes of other necessary services would increase the cost to the public by abusive utilization. There was no error in the trial court's resolution of this issue.

 Appellant next complains of the trial court's ruling that the result of his polygraph examination was not admissible in evidence.

While the police investigation was ongoing, appellant and a number of other persons voluntarily took polygraph examinations. In the examiner's opinion, appellant passed. After the indictment was returned, a stipulation of admissibility was entered into and signed by appellant's counsel, the Assistant Commonwealth's Attorney, and the appellant. The trial court even approved the stipulation which was comprehensively drafted and both parties waived every possible objection to admission in evidence of the result. By the time of trial, however, a new assistant Commonwealth's Attorney had been placed in charge of the prosecution and he moved to set aside the stipulation and prohibit introduction of the polygraph result. The motion was sustained.

We are well aware of our decision in *Workman v. Commonwealth*, Ky., 580 S.W.2d 206 (1979), in which we reiterated that the honor and dignity of the Commonwealth of Kentucky does not permit its agents to welsh on agreements. *Workman* contains compelling language concerning the duty of the Commonwealth to keep its word. Indeed, the indictment in *Workman* was ordered dismissed because of an agreement that it would be dismissed if the defendant passed the polygraph. This case is distinguishable from *Work-*

*man,* however, because Workman agreed to take the polygraph on the condition that a dismissal would result if he passed. Appellant took the polygraph before any agreement ever came into existence and the Commonwealth gratuitously agreed to its admissibility. Appellant did not alter his position or take any action in reliance on the agreement. We are also aware of our decision in *Colbert v. Commonwealth,* Ky., 306 S.W.2d 825 (1957), which appears to authorize agreements such as the one made here. In *Colbert* we stated or at least implied that if such agreements were in writing, the parties would be bound.

In recent years, this Court has taken an increasingly skeptical view of polygraph examinations. We have held that the results are unreliable and therefore inadmissible in evidence. *Stallings v. Commonwealth,* Ky., 556 S.W.2d 4 (1977), *Baril v. Commonwealth,* Ky., 612 S.W.2d 739 (1981), and *Henderson v. Commonwealth,* Ky., 507 S.W.2d 454 (1974). We have noted that by its very nature, a polygraph examination has an enormous propensity to influence the jury and prohibited any mention of the taking of such an examination. *Ice v. Commonwealth,* Ky., 667 S.W.2d 671 (1984), *Perry v. Commonwealth,* Ky., 652 S.W.2d 655 (1983). Our denunciation of the polygraph in the courtroom reached a new level in *Morgan v. Commonwealth,* Ky., 809 S.W.2d 704 (1991), in which we reversed the conviction because a police officer described as having "special interrogation skills" disclosed to the jury that the interrogation took place in a room in which was located a polygraph instrument. We noted that as presented, disclosure that the interrogation by an officer possessing special skills in a room with a polygraph instrument "amounted to a virtual banner headline" that appellant had been given a polygraph examination. We also held that after such an inference had been created, "the subsequent failure to inform the jury of any result brought about an additional inference that appellant failed the test."

In view of the resolute position we have taken on this issue, it would be duplicitous to now retreat on the basis of an improvident agreement by the Commonwealth.

Our decision in *Ice v. Commonwealth, supra,* provides ample basis for this Court to reiterate the inadmissibility of polygraph results and flatly declare that under no circumstances should polygraph results be admitted into evidence. To the extent our decisions in *Workman* and *Colbert* hold otherwise, they are hereby overruled.

While this Court would not countenance dishonesty or the taking of unfair advantage by the Commonwealth, neither will we perpetuate a practice which subverts rather than assists the truth-finding process. We hold the polygraph evidence offered here inadmissible not because of the Commonwealth's change of heart, but because appellant was never entitled to have the evidence admitted.

■ Appellant next claims reversible error in the trial court's murder instruction. Over objection, the trial court instructed the jury that it could convict appellant if it believed that "he, alone or in complicity with another," intentionally killed the victims. Appellant contends there was no evidence which authorized his conviction upon the basis of complicity; that all of the evidence of guilt showed that he alone did the stabbing.

The testimony of the various witnesses differs greatly, but a common thread may be found in the evidence concerning the alleged participation of Keith Dawson in the criminal episode. In his testimony, Dawson denied being on the premises when the crimes were committed or any other involvement, but he admitted that appellant had attempted to recruit him to participate in the robbery and that appellant stated an intention to kill Stacy Archie. Despite his denial of involvement, Dawson was quoted by other witness as having implicated himself. There was testimony attributing to Dawson a statement that he and appellant planned the robbery of Stacy Archie and that the two of them were in her apartment when the murders were committed. On cross-examination by appellant, Dawson admitted having made statements which indicated considerable knowledge of what transpired in the apartment and Dawson admit-

ted that he had expressed a "theory" as to who committed the crimes.

Appellant's defense was to deny involvement and attempt to show that Dawson was guilty. Dawson denied involvement but gave testimony which heavily implicated appellant. From the totality of the evidence, the jury could have reasonably believed that Dawson and appellant formed a plan to rob and kill Stacy Archie and entered her apartment in furtherance of the plan. Upon the basis of appellant's denial and the evidence of Dawson's involvement, the jury could have disbelieved the evidence that appellant killed the victims and concluded that Dawson was the killer. Said otherwise, upon the evidence that appellant and Dawson were both in the apartment after having planned the robbery and murder, appellant's denial of any involvement, together with his attempt to show that Dawson was guilty, was sufficient to create an issue of fact as to whether appellant was the principal actor or merely acted in complicity with Dawson. Upon such disputed evidence, the jury was not required to believe all of appellant's version or all of Dawson's version. It was entitled to believe and disbelieve particular portions of each in arriving at its verdict.

We need not dwell on the well-established law that the trial court should instruct the jury "on the whole law and this rule requires instructions applicable to every state of case deducible or supported to any extent by the testimony." *Kelly v. Commonwealth*, Ky., 267 S.W.2d 536, 539 (1954). As discussed hereinabove, the evidence presented was sufficient to justify the instruction on complicity liability.

Appellant's next claim for reversal arises out of his aborted attempt to call Sherman Noble as a witness. Evidently, Noble had confessed to committing the crimes with which appellant was charged. At the conclusion of a hearing on the objection of Noble's counsel, the trial court determined that Noble could not be called to the stand. █ A portion of the hearing was *ex parte* and as to that part and appellant's contention that he was denied due process of law in that neither he nor his counsel

was present, we find lack of preservation. When informed that counsel for the intended witness wanted to be heard privately by the judge on his objection, appellant's attorney responded, "Go on. I don't care." Appellant's express authorization of the *ex parte* proceeding constitutes a waiver of any objection on this ground. *McDonald v. Commonwealth*, Ky., 554 S.W.2d 84 (1977).

█ The basis for the objection to having Noble called as a witness was that any testimony would violate his right against self-incrimination and that he was wholly incompetent to participate in the proceedings. In open court and in the *ex parte* hearing, information was presented which showed that Noble was then under indictment for two counts of capital murder and proceedings were then pending in which Noble's competency was being adjudicated. Medical reports were presented to the trial court which showed that Noble was actively psychotic and unable to communicate on any level. Noble's counsel objected to having his client called to the witness stand and sworn on the grounds that such might constitute an implicit finding of competency and that any claim of a privilege against self-incrimination would imply a knowing and intelligent decision. Asserting a right to claim the privilege against self-incrimination on behalf of his client, Noble's counsel unambiguously stated that the privilege was being asserted. In his brief, appellant has made statements which deny that counsel asserted the privilege. This Court has carefully reviewed the record and this contention is incorrect.

In *Commonwealth v. Brown*, Ky., 619 S.W.2d 699 (1981), this Court held that a witness should not be called to testify when the party producing the witness knows that he will assert the privilege against self-incrimination. We noted that to do so would result in prejudice of constitutional proportions. In *Commonwealth v. Gettys*, Ky.App., 610 S.W.2d 899 (1981), the Court of Appeals at length described the procedure to be observed to determine whether a witness may rightfully claim the privilege against self-incrimination. At the *Gettys*

hearing, the court is required to determine whether a responsive answer would "furnish a necessary link in the chain of evidence which might convict or implicate a witness." *Id.* at 901. Due to the infinite variety of circumstances in which a witness may claim the privilege, it is impossible to develop a precise formula to be observed by the trial court in every case. The facts in *Gettys* differ vastly from the facts presented here. Unlike *Gettys* which required an analysis of questions likely to be asked and their subtle implications, the only questions which would likely have been asked here were whether Noble had made statements admitting the crimes with which appellant was charged and whether Noble indeed had committed those crimes.

As demonstrated herein, the trial court was faced with a highly unusual circumstance in which a witness of doubtful competency, who was then under indictment for committing capital crimes, was sought to be examined as to whether he committed the murders for which appellant was on trial. On behalf of the witness, there was a clear assertion of the privilege against self-incrimination. The trial court then heard evidence as to the basis of the claim of privilege and the mental condition of the witness and made a reasoned determination that under such circumstances, the witness should not be called, sworn or required to personally assert his privilege against self-incrimination. We find no abuse of discretion in this procedure and the trial court's findings were not clearly erroneous.

■ There is no merit in appellant's contention that he was denied due process of law when the trial court excluded evidence that Keith Dawson had been convicted of the robbery. Prior to appellant's trial, Keith Dawson was tried for the robbery and murders. The jury found him not guilty of murder but guilty of robbery. Dawson's post-trial motion for new trial was granted and the Commonwealth subsequently dismissed the robbery charge. Appellant sought to introduce the jury verdict from Dawson's trial. This verdict was nullified by the court's ruling and there was no conviction to introduce.

■ Appellant's final claim of error concerns a question asked on cross-examination by the Commonwealth. A Jefferson County Corrections employee was called as a witness for appellant. On cross-examination, he was asked if appellant had been involved in "strongarming" someone in jail. Appellant's objection was sustained, his requested admonition was given, and he did not move for a mistrial. During its deliberations, the jury sent a note to the trial court in which it asked whether the evidence of misconduct by appellant while in jail was to be considered. The trial court responded by again admonishing the jury not to consider any such evidence and appellant still did not move for a mistrial.

Not until his motion and grounds for a new trial did appellant seek relief. In *West v. Commonwealth*, Ky., 780 S.W.2d 600 (1989), this Court reiterated the requirements of RCr 9.22 and restated the familiar rule that a party who claims entitlement to a mistrial must timely ask the court to grant such relief. We relied on our decisions in *Futrell v. Commonwealth*, Ky., 437 S.W.2d 487 (1969), *Brown v. Commonwealth*, Ky., 551 S.W.2d 557 (1977), *Salisbury v. Commonwealth*, Ky.App., 556 S.W.2d 922 (1977), and *Cosby v. Commonwealth*, Ky., 776 S.W.2d 367 (1989), for the proposition that, in general, a party who recognizes error and seeks an admonition but does not seek a mistrial may be deemed to be satisfied with the relief given or, despite the error, desires to have the jury as empaneled render the verdict.

Despite our view that this issue is unpreserved, we are without reluctance in saying that appellant is not entitled to relief pursuant to RCr 10.26 nor would he have been entitled to a mistrial had the motion been timely made. The statement and error of which appellant now complains is of the type which an admonition is designed to cure. Considering the charges against appellant and the evidence heard by the jury, mention of the fact that he had been accused of strongarming another prisoner while in jail would not have affected the jury's assessment of appellant's guilt.

Having fully reviewed every claim for reversal presented by appellant and concluded that there was no error which warranted such relief, the judgment is affirmed.

STEPHENS, C.J., and COMBS and REYNOLDS, JJ., concur.

LEIBSON, J., concurs in part and dissents in part by separate opinion.

SPAIN, J., concurs in part and dissents in part by separate opinion in which WINTERSHEIMER, J., joins.

LEIBSON, Justice, concurring in part, dissenting in part.

As does my colleague, Justice Spain, I concur in the results in this case, but I respectfully dissent from so much of our decision as would not apply *Workman v. Commonwealth*, Ky., 580 S.W.2d 206 (1979), where the Commonwealth and the accused have made a valid agreement in advance for the accused to take a polygraph examination and for the results to be used as evidence, or for the case to be dismissed where the results indicate the accused is telling the truth in denying his guilt.

In my view polygraph examinations are unreliable, and should not be utilized as evidence. Nevertheless, as with the competency of any other evidence, such results should be admissible where the parties have made a knowing and voluntary agreement, supported by an appropriate *quid pro quo* regarding the use of the results of such an examination.

The reason I agree in the results in this case is because there was *no* consideration for the Commonwealth's agreement permitting the use of the results from the polygraph examination, and, therefore, there was no reason to prevent the Commonwealth from changing its mind.

SPAIN, Justice, concurring in part and dissenting in part.

I agree with the majority that the judgment of conviction and sentence imposed upon the appellant ought to be affirmed and generally agree with the opinion of the majority. I nevertheless respectfully dissent from so much of the opinion as overrules our decisions in *Workman v. Commonwealth*, Ky., 580 S.W.2d 206 (1979), and *Colbert v. Commonwealth*, Ky., 306 S.W.2d 825 (1957). I dissented in *Morgan v. Commonwealth*, Ky., 809 S.W.2d 704 (1991), because I saw no reversible error in the mere mention of the fact that an interrogation of the defendant took place in a room in which a polygraph machine was present, especially where the defense persisted in eliciting the information. I also see no inherent evil in admitting the results of a polygraph examination where both the defendant and Commonwealth agree in advance to be bound by the results.

WINTERSHEIMER, J., joins in this dissent.