## Feree v. Commonwealth.

(Decided January 10, 1922.)

# Appeal from Hardin Circuit Court.

1. Criminal Law—Capacity to Commit and Responsibility for Crime. —Where a defendant in a criminal case pleads, in defense of the charge in the indictment, that he was insane at the time of the commission of the crime, the burden is on him to show by a preponderance of the evidence that his mind was so unbalanced or so far gone that he did not know right from wrong, and was not able to comprehend or realize what he was doing or the natural consequences of his act.

2. Criminal Law—Mental Capacity—Non-Expert Witnesses.—Before a non-expert witness can be allowed to express an opinion as to the mental condition of a defendant in a criminal prosecution, he must state facts sufficient to show that he had opportunity to see, observe and to form an opinion as to the mental status of the defendant, and even then his opinion is not of so much value, as evidence, as the facts upon which it is based.

3. Criminal Law—Insanity as a Defense.—Although a defendant may plead insanity in defense of the charge in the indictment and call witnesses to testify to facts fully sustaining his plea, yet if there be evidence to the contrary, tending to show that the defendant at the time of the commission of the crime had sufficient mind to know and understand what he was doing, and that the act he was about to commit was wrong, the case is one for the jury.

4. Criminal Law—Self-Defense—Instructions.—Where the defendant does not plead self-defense and there is no evidence tending to show that the killing was done in defense of the defendant, the trial court should not give an instruction upon self-defense.

H. L. JAMES and G. K. HOLBERT for appellant.

CHAS. I. DAWSON, Attorney General, and THOS. B. McGREGOR, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE SAMPSON—Affirming.

The appellant, Cyrus Feree, having been convicted in the Hardin circuit court of the crime of wilful murder, brings his case to this court for review, urging a reversal of the judgment against him upon the following grounds:

(1) The trial court erred in overruling a motion for an instruction to the jury to find him "not guilty" on the grounds of insanity.

(2) The verdict of the jury is palpably against the evidence.

(3)   The trial court erred in allowing non-expert witnesses for the Commonwealth who had not associated with, or had opportunity to observe the acts and conduct of the appellant, to express an opinion as to the mental condition of the appellant.

(4)  Instructions given by the court to the jury were erroneous and prejudicial to appellant.

(5)   Appellant did not have a fair and impartial trial.

Appellant Feree, a man about forty-eight years of age, shot and killed W. H. S. Ritchie in Hardin county in March, 1921.  The deceased was more than seventy years of age and the marshal of the town of West Point on the Ohio river.  As marshal of the town of West Point, Ritchie had in his hands for execution a *capias pro fine* against appellant Feree, and also a summons on a petition of lunacy against the said Feree.  For the purpose of executing this process, Ritchie and one Goldsmith went to the home of appellant Feree.  On their arrival at the house in the country the son of Feree came out to meet them, and immediately following the boy came appellant, who very cordially greeted Marshal Ritchie and invited him into the house, Goldsmith remaining on his horse in front of the premises.  The front door was closed, but very shortly after appellant and Ritchie went into the house, Goldsmith and the boy heard loud talking within, and immediately the door opened and appellant pushed Ritchie out at the door with his left hand, bringing with him a double-barreled shot gun in his right hand.  Ritchie was protesting against the abuse which appellant was heaping upon him, and telling appellant that he, Ritchie, was an officer and had a right to be there for the purpose of executing process.  Notwithstanding this, Feree shoved the deceased off the porch in front of the house, and while the deceased was fumbling in an effort to put his glasses into the case, appellant raised the shot gun and fired two shots into the head and face of Ritchie, killing him almost instantly.  Appellant then called out loudly for some one to bring him more shells for his gun.  Frightened by the deadly assault of appellant Feree, Goldsmith and young Joe Feree immediately fled down the road.  It was an hour or more before any one came to the body of the deceased, which at that time had been covered by a sheet on which small stones had been laid as weights and a cocked pistol placed near the hand of the

corpse. The glasses of Ritchie were also lying on the ground near his body. All these facts are admitted. There was no effort on the part of the defendant to disprove or explain the evidence of the Commonwealth as to how the homicide occurred. In making a statement about the difficulty and the cause of the homicide to the first persons who appeared after the tragedy, appellant Feree stated that he killed Ritchie in self-defense; that Ritchie was in the act of shooting appellant at the time appellant fired the shots which took the life of Ritchie.

In defense of the charge in the indictment, Feree, by counsel, pleaded that he was insane at the time he shot and killed Ritchie, and in support of this plea called a number of witnesses, including several doctors and one alienist, who expressed the opinion that Feree was insane at the time of the homicide, and, therefore, irresponsible. Appellant Feree did not testify. One witness for appellant testified that he resided in West Point and conducted a store, at which appellant frequently traded, and that the witness and appellant often conversed together. The witness then related certain circumstances and conversations had with appellant upon which he based his opinion that appellant Feree was of unsound mind. Part of his evidence is as follows:

"About six weeks ago he came into my store one day and called me to the rear of the store. And he says, 'Mr. Brown, do you know any of the Moormans?' I says, 'Yes, I know some of them.' I says, 'I know Judge Henry DeHaven Moorman and the one your daughter married and a few others. I know of a lot.' And he says, 'Do you know if any are Catholics?' And I said, 'I didn't know about that.' He said, 'Well, my daughter has been sick and I thought if there were any Catholics in the family they have been doping her.' Another time he came to my store, possibly ten days or two weeks before the killing, and he asked me if any of the Roberts were Catholics. He asked about Dr. and Elmer. I said, 'Neither of them are that I know of.' He said, 'I think Elmer is or was raised a Catholic.' I said, 'I don't know whether he was or not.' He said, 'You know he has a boy that is afflicted, and if he is a Catholic he is doping that boy.' I said, 'Possibly so; I don't know.'" Continuing the witness said: "He (Feree) said the Catholics had a secret way of knowing everything. He said he married a Catholic; that she was raised a Catholic but left that church, and he said he believed they would fol-

low a person through life and watch them if they left the Catholic church.'' In answer to other questions the witness said: ''Yes, he told me that he was a wagon maker, and it was during an A. P. A. uprising or organization, and he said he was doped by a Catholic saloon keeper.''

The same witness related several other incidents in the life and conversation of appellant Feree, indicating that he had mental delusions. It is also in evidence that some years before the killing of Ritchie appellant was working in a wagon shop in the city of Louisville, when a strike among the workmen arose, and appellant refused to join the union, although importuned to do so. The excitement attendant upon the strike appears to have upset his nervous system to some extent, and he was advised by friends to move to the country, whereupon appellant took up his residence in Hardin county. From this time on his physical and mental condition improved and he became, according to some of the evidence, an exceptionally good farmer and a fairly good business man. In the record are several letters written by appellant relative to business matters. The penmanship is unusually good, but the thought is not altogether clear. Shortly before the homicide appellant had trouble with some of his neighbors, and as a result he was fined in the quarterly court, on which judgment the *capias* above referred to was issued. As an incident to that litigation it seems that a lunacy inquest was sought by some of appellant's neighbors, and he was summoned to appear upon the inquisition. By some of his most intimate associates it was proven that appellant, from boyhood up, was a self-willed, stubborn individual, whose mind could not be changed upon a subject after it was once fixed.

On the other hand, a number of witnesses, including appellant's banker, a merchant, and other business men and associates of appellant, testified that they had known and associated with appellant for years and had always considered him sane; that he had sufficient mind to know right from wrong, to attend to business, trade, buy and sell, make a living and provide for his family. While there were five or six witnesses for the defendant, who testified that he was mentally unbalanced and irresponsible, the Commonwealth called about twice as many witnesses who gave evidence tending to show that appellant Feree was a man of sound mind, or at least of sufficient

mind to know right from wrong and to judge the consequences of his own acts.

With the evidence so conflicting upon the question of the mental state of the appellant, the trial court properly overruled the motion of appellant for a directed verdict in his favor, for in every such criminal case, where there is evidence tending to establish the guilt of the defendant, even though there be much evidence to the contrary, the question is one for the jury. Miller v. Commonwealth, 182 Ky. 442; Owens v. Commonwealth, 181 Ky. 257; Daniels v. Commonwealth, 181 Ky. 392.

Notwithstanding the opinion of the learned alienist, who testified for the appellant, we are constrained to the opinion that, all the circumstances considered, appellant had sufficient mentality to know right from wrong, and did in fact know and understand what he was doing at the time he shot and killed Ritchie. It follows, therefore, that the trial court properly overruled appellant's motion for a directed verdict in his favor.

No rule is more generally acknowledged, nor more fully sustained by reason, than the one which presumes every person to be of sound mind until the contrary is shown by a preponderance of the evidence. One who enters a plea of insanity to a criminal charge must show by a preponderance of the evidence that his mind was so far gone, so diseased and unsound that he did not know the consequences of his act, nor realize that he was doing wrong at the time the act was done of which complaint is made. It is the theory of some students of psychology and assented to by many well known alienists, that most persons have insane delusions on one or more subjects although they are of sound mind upon all other subjects and may be good business people, industrial workers, or leaders of thought, and this may or may not be true. We think, however, that the true test in criminal cases is, did the defendant at the time he struck the blow or fired the shot which injured or killed another, know or realize the consequences of his act? If he did, then he is guilty both at law and in morals. If he did not know and was not able to realize the consequences of his act, then he was not responsible therefor, either in law or morals. Even though one may be possessed of insane delusions upon one or more subjects, he is liable for his criminal acts, if at the time he performs them, he knows and realizes that he is doing wrong. Cases are not infrequent in which one

is sane part of the time and insane at other times. If such a one commit a crime during his lucid intervals he is as responsible as if he had never suffered from dementia. Appellant Feree may have been insane, or so unbalanced mentally at the time of his breakdown in the shops in Louisville that he would not have been responsible for his criminal act, but if he afterwards recovered, his responsibility returned at the same time. Moore v. Commonwealth, 92 Ky. 636.

Appellant complains that the trial court allowed non-expert witnesses, testifying for the Commonwealth, to express an opinion as to his mental condition at the time and before the homicide without such witnesses first showing that they had seen, associated with, and observed appellant for a sufficient length of time to enable them to form an opinion as to the state of his mind. This contention, it appears to us, is without foundation. All of the lay witnesses who testified for the Commonwealth gave the facts upon which their opinion as to the appellant's mental condition was based. His banker, W. E. Ballinger, with whom he did business for several years and with whom he had frequent conversations, testified:

"I considered him a sane man when he transacted business with me. He is a good business man and is pleasant to deal with."

The opinion of this witness as to the mental soundness of appellant was based upon many transactions as well as conversations and acts of the appellant which are set forth in his evidence. Our rule is to allow a non-expert witness to give his opinion as to the mental condition of another only after he has testified to facts showing a familiarity of the witness with the life, habits and conduct of the one whose mental condition is under consideration, and even then his opinion, we have held, is not so important as the evidence which he gives showing the idiosyncrasies, or normalcy of the mind of the one under inquiry. In other words, the opinion of a non-expert witness as to the mental status of another cannot be received in evidence because it has no probative value unless the opinion be supported by a statement of facts from which the opinion can be and is reasonably deduced, and the opinion can be of no greater value as evidence than the facts upon which it is based. Wood v. Corcoran, Administrator, 192 Ky. 774; Schrodt v. Schrodt, 189

Ky. 457; Hunt's Heirs v. Hunt, 3 Ben Monroe 577; Turner v. Grace, 185 Ky. 457.

The second witness, Henry Bunger, called by the Commonwealth to disprove the insanity of appellant, after testifying that he had known and associated with the appellant Feree for twelve or fifteen years, was asked:

"Q. Have you had any business transactions with him? A. I have. Q. I will get you to state, Mr. Bunger, whether or not in your opinion from what you know of him during the time you have known him, up to and including the last time you saw him and had conversation with him, is he a man of sound mind or unsound mind? A. I think he is a man of sound mind. Q. Has he sufficient mind to know right from wrong? A. He has. . . . A. No, he was very pleasant with me. I was there about two weeks before this trouble. I went there to see him about leasing his place for oil and gas, but he would not lease it. He was very pleasant and agreeable. Q. You could not get a lease from him on his place? A. I could not. Q. Did he become angry at you on that occasion? A. No."

The third witness, Mr. S. W. Winterbower, stated that he had known appellant for about fifteen years and had seen him about twice a month during that time, had talked with him frequently; that the witness was in the lumber business but formerly traded in livestock; that he had made many trades with appellant and had bought hay and hogs from him. In answer to a question as to whether the witness believed that appellant had sufficient mind to know right from wrong, he answered, "Yes." The next question propounded to this witness was:

"Q. Tell what kind of a farmer he was. A. Good farmer. Q. What was the condition of his farm? A. Fine condition. . . . Q. What kind of intelligence did he have? A. He was as smart as anybody."

The fourth witness, Mr. Robert Johnson, who had known him for four or five years and had seen and talked with him at frequent intervals during that time, expressed the opinion that appellant was of sound mind throughout his acquaintance with him. So it appears that all of the foregoing witnesses, as well as several others whose evidence is copied in the record, were each asked and allowed to tell about their acquaintance and

association with appellant before the killing, and each witness related facts showing that he had opportunity to and did know, associate with, and observe appellant Feree, which evidence it appears to this court was sufficient to warrant the trial court in allowing said witnesses to express an opinion as to the mental condition of appellant at the time and before the homicide.

Although complaint is made by appellant of the instructions given to the jury, we can find no prejudicial error therein, although they are entirely too long and in part deal with abstract questions of law. In brief of counsel for appellant it is said that the self-defense instruction given by the court erroneously qualified the right of the accused to defend himself.

There was no plea of self-defense by the defendant and all the evidence on the subject tends clearly to show that the deceased Ritchie was not attempting in any way to injure or harm appellant Feree at the time the latter shot and killed Ritchie. In fact Ritchie, who no doubt had presented one of the court papers to appellant in the house where it was later found on the floor, was merely protesting against the rough usage and threatening attitude of appellant as appellant put the deceased out the front door and off the porch. Ritchie had no weapon in his hand at the time the shots were fired which took his life, nor was he attempting to defend himself in any manner whatever against the assaults of Feree. At the instant the fatal shots were fired Ritchie was doing nothing more serious or threatening than taking his glasses from his eyes, folding them, and attempting to put them into the case which he had partly in his hand, at the same time informing appellant that he, Ritchie, was an officer of the law with process to serve on appellant, and appellant was acknowledging the reception of such information by saying back to Ritchie: "You may be an officer of the law, but you are no officer on my farm." Manifestly on these facts and the plea entered by appellant, there was no reason for the trial court giving to the jury an instruction upon the law of self-defense. No such instruction was asked. Out of an abundance of precaution no doubt the trial judge did give a self-defense instruction, qualifying it only by telling the jury that the appellant had no right to shoot Ritchie, a peace officer with process to serve, if appellant knew that Ritchie was

such officer and was there for the purpose of serving process on the appellant, and Ritchie offered no force or violence to appellant, to avert which it was necessary for appellant to shoot and kill Ritchie. The instruction should not have been given in any form, but in the form it was given it was entirely too favorable to appellant. He relied solely upon his insanity as a defense to the charge in the indictment. The evidence offered in support of this plea was not sufficient to satisfy the jury that appellant was insane or his mind so far gone that he did not know right from wrong at the time he so mercilessly shot and killed Ritchie. There was no prejudicial error in the instructions of the court, and the evidence heard by the jury fully supports the verdict.

Judgment affirmed.