Todd ICE, Appellant,

v.

COMMONWEALTH of Kentucky,
Appellee.

Supreme Court of Kentucky.

Feb. 16, 1984.

Rehearing Denied May 10, 1984.

Jack E. Farley, Public Advocate, M. Gail Robinson, Asst. Public Advocate, Kevin Michael McNally, Asst. Public Advocate, Frankfort, for appellant.

David L. Armstrong, Atty. Gen., Joseph R. Johnson, K. Gail Leeco, Asst. Attys. Gen., Frankfort, for appellee.

Lee W. Rowland, Mark Skillern, Lexington, for amicus curiae, Central Kentucky Civil Liberties Union.

## OPINION OF THE COURT

On December 5, 1978, in a rural section of Powell County, a little girl named Donna Knox, age 7, was the victim of a particularly vicious and gruesome murder. Todd Ice, age 15, is charged as her murderer. The evidence portrays him as Jekyll and Hyde, an exemplary student and a fiendish killer.

Donna lived with her mother and father in a trailer. Todd Ice and his family were their nearest neighbors. The two families lived on opposite sides of a service road leading off of Ky. 15 at a point about six miles from Stanton and fifteen miles from

Campton. They had been neighbors for six years.

The Ice boy had been suspected and accused by the Knox family of pilfering from their trailer. The Commonwealth claims that this tragedy was motivated by Ice's desire for revenge against the child's father for his accusations.

The principal evidence convicting Ice was the testimony of the child's mother, Sheila Knox. Mrs. Knox testified that she returned home with her daughter to find that her house had been broken into. As she tried to get herself and the child out of the house, she was accosted by Ice wielding a hunting knife, slashed across the back, and then forced into the bedroom where she was tied up and beaten by him. There was other testimony showing that her throat was cut, but she became unconscious before this occurred, so she could not identify the person who did it.

After Sheila Knox was unconscious, the child was murdered with a knife in the bedroom. The knife used to cut Sheila Knox's throat and to stab and slash the child was a different knife or knives than the hunting knife originally used to slash Sheila Knox.

Although Sheila Knox identified Ice as the only person she saw in the trailer at the time, the defense claimed that another neighbor boy, Norvin Mayberry, had gone to the trailer with Ice and was responsible for slashing Sheila Knox's throat after she became unconscious and for murdering the child.

The evidence for the defense was that shortly after the occurrence, while a patient at Northern Kentucky Treatment Center, Department for Human Resources, for evaluation of mental condition and drug abuse, Norvin Mayberry confessed to the crime repeatedly and in some detail over a period of nine or ten months. Mayberry later recanted and denied any participation.

The second aspect to the defense was to claim, in the alternative, that if Ice was guilty of the crime that he should be found not guilty by reason of insanity. This defense was based on the testimony of several psychologists and a psychiatrist to the effect that Ice was suffering from serious mental illness at the time. The psychiatrist testified he believed Ice experienced a psychotic break and disassociative reaction at the time of the crime. The psychiatric experts all agreed that Ice does not remember what happened because he could not tolerate knowing that he was involved in a crime of this nature, that he hallucinated an alibi for the time involved, and that he did not know the difference between right and wrong and could not control his behavior at that time.

After the defense's opening statement pointing the finger of guilt at Norvin Mayberry, the Commonwealth demanded and received over the objection of the defense the right to conduct polygraph tests on both Mayberry and his mother, the sole purpose of which was to prove that the Mayberrys, who would be witnesses, were telling the truth when they denied Mayberry had any participation in this crime. The polygraph examiner performed the tests while the trial was in progress and testified in chambers that in his opinion the test results showed Mayberry and his mother were telling the truth in disclaiming his involvement.

When Mayberry testified, he denied any involvement in the murder. Further he testified about drinking bouts with Ice using whiskey Ice had stolen from the Knox trailer, and threats Ice supposedly made against the decedent's father for having caught him and threatened him on one occasion. He was a key witness.

Mayberry also testified about having been suspended from school the day before the occurrence, having been home with his mother at the time of the occurrence, and having confessed to the doctors at Northern Kentucky Treatment Center "to get them crazy doctors off my back." He was also permitted to testify over objection that he and his mother took lie detector tests and passed them, and later his mother testified to the same effect.

The polygraphist confirmed that his test results showed that Mayberry and his mother were telling the truth. He was cross-examined about failure to use "control questions" in testing, about the fact that courts generally do not admit polygraph test results, and about how the taking of drugs could affect the results of a polygraph test.

The jury deliberated thirty minutes and found Todd Ice guilty of murder.

The court then proceeded with the second stage of the trial, jury consideration of the death penalty under KRS 532.025. At the outset the prosecutor stated that the jury would simply make a recommendation as to the death penalty and the burden would rest upon the judge to make the final determination: "It will be his decision." The Commonwealth then introduced proof that a burglary had occurred. The defense offered testimony of mitigating circumstances related to Ice's youth, church activities, 4-H club activities and awards, good school record and intellectual ability in spite of his emotional instability and mental illness, and pointed to the fact that he had never been in trouble before, much less charged with violation of the law.

After little over an hour of deliberation, the jury brought in the death sentence.

Before considering specific allegations of error, there are several general propositions which must be discussed.[1]

■ First, RCr 9.22 requires that, as a general rule, the defendant must object to the action of the trial court in order to preserve a claim of error. Appellant cites us to cases standing for the proposition that in a case where the death penalty has been imposed by the trial court an exception exists to this contemporaneous objection rule.[2] These cases hold that in a death penalty case every prejudicial error must be considered, whether or not an objection was made in the trial court. As stated in *Edwards v. Commonwealth*, 298 Ky. 366, 182 S.W.2d 948 (1944), at p. 374, 182 S.W.2d 948: "(W)here the defendant's life is at stake, technical rules of procedure must give way to the more lofty aim that justice may be done." KRS 532.075, the statute regarding review of sentence by the Supreme Court in death penalty cases, adopts and incorporates these decisions in subsection 2, where it states: "The Supreme Court shall consider ... any errors enumerated by way of appeal." In these circumstances, the question of whether objection was made at the trial level is only significant where it may reasonably be inferred that appellant intentionally failed to object for reasons of trial tactics.

Next, a significant portion of the appellant's brief is devoted to procedures and considerations mandated for the Supreme Court under KRS 532.075 when reviewing whether the death penalty is appropriate to the case. For instance, an elaborate procedure is established for accumulating records of other felony offenses where the death penalty was considered and reviewing such records to determine whether the sentence under consideration is disproportionate by comparison. These statutory mandates are designated for cases where the death penalty is affirmed, not for cases reversed for further proceedings on other grounds. Because this case must be reversed for reasons which will be discussed, there is no need for this court to make an independent review of whether the death penalty would be appropriate. The question is moot at this time and any consideration of it has become theoretical.

## I. POLYGRAPH EVIDENCE

■ As previously noted, after the defense made an opening statement outlining

---

1. Some comment is necessary regarding the almost unbearable ordeal imposed upon this Court by the briefing procedures. The statement of facts was presented in a rambling witness-by-witness narrative, 41 pages long. Many arguments were fragmented and confused by repetition. Myriad cases are cited unnecessarily—some inappropriately. Such briefs defy rather than encourage rational consideration of the case.

2. *Edwards v. Commonwealth*, 298 Ky. 366, 182 S.W.2d 948 (1944); *Bowman v. Commonwealth*, Ky., 290 S.W.2d 814 (1956); and *Smith v. Commonwealth*, Ky., 366 S.W.2d 902 (1962).

Norvin Mayberry's confessions of guilt and as the trial progressed, the Commonwealth was permitted by the court to conduct a polygraph examination of both Mayberry and his mother to corroborate his subsequent denial of any involvement. It is difficult to understand an error of this magnitude.

This court has held repeatedly and consistently that it does not yet consider such evidence scientific or reliable.[3] We have not only excluded the evidence of polygraph examiners, but excluded mention of the taking of a polygraph, the purpose of which is to bolster the claim of credibility or lack of credibility of a particular witness or defendant. *Perry v. Commonwealth,* Ky., 652 S.W.2d 655 (1983).

Recently this court contrasted the reliability of new blood tests with the unreliability of the polygraph, "the results of which depend heavily on the skill of the operator, and in which factors other than truthfulness are known to affect the result. *Brown v. Commonwealth,* Ky., 639 S.W.2d 758 (1982).

Appellant has cited us to numerous articles and recent decisions from sister states discussing the continued view that polygraph tests are unreliable.

"The estimated range of error for a given polygraph examination, assuming that the examiner is properly qualified, has been variously stated as 5%, 10%, 25% and 30% by experts." *State v. Biddle,* 599 S.W.2d 182, 189–190 (Mo.1980).

Because "there is significant risk the jury will regard such evidence as conclusive," such a margin of error is intolerable. *People v. Baynes,* 88 Ill.2d 225, 58 Ill.Dec. 819, 828, 430 N.E.2d 1070, 1079 (1982). Our review confirms that there is no trend towards admitting such evidence. The trend is to the contrary. There are many distinctions between polygraph evidence and other types of scientific evidence and expert testimony, such as the fact that polygraph examiners usually lack general

scientific training, the subjectivity of this type of examination, the inability to control factors that affect the reliability of such tests, and, most importantly, this evidence like no other usurps the ultimate function of the jury "as finder of fact to determine the credibility of witnesses." *People v. Baynes,* supra.

The jury, not the polygraph examiner, should have decided whether Mayberry told the truth when he confessed to professionals at the Northern Kentucky Treatment Center that he killed Donna Knox.

■ The prosecutor is accused of prosecutorial misconduct on a number of grounds, many of which are justified. His direct and cross-examination of witnesses reads like a bad television scenario.

An example of his technique on cross-examination: Dr. Lange, a child psychiatrist called by the defense, had stated rather positively that in his opinion Ice suffered from schizophrenia and at the time of the murder was experiencing a psychotic break (an episode of acute psychotic disorder) which began before he went into the trailer and continued until after he returned home. On cross-examination, the prosecutor repeatedly and consistently misstated the doctor's testimony. He did so again in final argument.

It is not possible in this opinion to give a course in direct and cross-examination. Suffice it to say that direct examination that not only states the premise but argues for it is objectionable on both scores, and cross-examination that misstates the witness' previous answers falls in the same class. His offenses were neither occasional nor sporadic. They were continuous and pervasive.

■ There was a great deal of material of little or no probative value, but highly inflammatory, introduced in this case. One example is the manner in which photographs of the deceased child were intro-

---

**3.** *Colbert v. Commonwealth,* Ky., 306 S.W.2d 825 (1957); *Henderson v. Commonwealth,* Ky., 507 S.W.2d 454 (1974); *Stallings v. Commonwealth,* Ky., 556 S.W.2d 4 (1977); *Baril v. Commonwealth,* Ky., 612 S.W.2d 739 (1981).

duced through the mother of the victim, interspersed with questions regarding her great love for the child and the terrible loss she had sustained. A second is the questioning of a minister as to his study of biblical scriptures and his views that the bible "(teaches) the death penalty for murder and other crimes." This testimony was followed by examples from the scriptures and concluded by his view expressed on cross-examination that this jury would be condemned by God if they did not kill Ice. The law specifies when the death penalty is appropriate, and neither the prosecutor nor the defense counsel should be permitted to adduce evidence as to how this case should be decided on religious grounds. Evidence to engender sympathy for the victim and her family and the evidence about religious convictions as to the death penalty violate the rule excluding evidence where its probative value is slight and far outweighed by its inflammatory nature. Cf. *Empire Metal Corp. v. Wohlwender*, Ky., 445 S.W.2d 685 (1969).

Appellant complains, with justification, of prosecutorial misconduct in closing argument. For obvious reasons, this court has held that the prosecutor must not comment about the possibility of an appeal. *Goff v. Commonwealth*, 241 Ky. 428, 44 S.W.2d 306 (1931). The prosecutor broke this rule.

■ For the same reasons emphasis on the jury's sentence as only a recommendation is improper. It conveys "the message that the jurors' awesome responsibility is lessened by the fact that their decision is not the final one ...." *State v. Willie*, 410 So.2d 1019, 1034 (La.1982). The prosecutor broke this rule, telling the jurors that they simply "recommend" the death penalty and "are not killing Todd."

■ The most serious prosecutorial misconduct in closing involved inveighing the jury that Ice should not be "turned loose to kill again" ("Does he already have his limit or is he entitled to kill some more?"), urging the jury to make an example of the defendant (send a message to "everyone else similarly situated"). In *Payne v. Commonwealth*, Ky., 623 S.W.2d 867

(1981), dealing specifically with argument about the effect of a verdict of not guilty by reason of insanity, we stated at p. 870:

"(N)either the prosecutor, defense counsel, nor the court may make any comment about the consequences of a particular verdict at any time during a criminal trial."

Next, there are several points related to voir dire which should be discussed briefly.

■ *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), both authorizes the prosecutor to inquire of prospective jurors as to possible consideration of the death penalty and circumscribes the limits of such inquiry. In the main, the trial court adhered to the mandates of *Witherspoon* in this case. However, questioning prospective jurors as to whether they might be able to consider inflicting the death penalty "if the evidence *in this case* should warrant it" exceeds the mandates of *Witherspoon*. A venireman cannot be asked on voir dire whether he would consider imposing the death penalty in the particular case before him. In *Jaggers v. Kentucky*, 403 U.S. 946, 91 S.Ct. 2282, 29 L.Ed.2d 856 (1971), the United States Supreme Court reversed *Jaggers v. Commonwealth*, Ky., 439 S.W.2d 580 (1968), because the jurors were asked the question in this manner.

In *Witherspoon* the United States Supreme Court holds that "a prospective juror cannot be expected to say in advance of trial whether he would in fact vote for the extreme penalty in the case before him." 391 U.S. at 522, Note 21, 88 S.Ct. at 1777, Note 21. Whether or not jurors were permitted to serve in this case in violation of this standard is debatable. It is not debatable that questions were asked improperly directed towards this subject matter.

■ It was proper to question the jurors as to whether they could consider an insanity defense. For reasons previously stated, it was improper to inject into such questioning whether a verdict of not guilty by reason of insanity would result in "turning the defendant loose." The consequences of

such a verdict are irrelevant to the jury's function and not a proper subject for questions. *Paul v. Commonwealth*, Ky., 625 S.W.2d 569 (1981).

## II. INSTRUCTIONS

■ We turn now to the instructions to the jury at the close of the case. First, appellant complains that the instruction given to the jury on the subject of murder in the guilt phase of the case was erroneous. The trial court instructed the jury that appellant could be convicted of murder if he caused Donna Knox's death "intentionally" or "wantonly ... under circumstances manifesting an extreme indifference to human life." Appellant complains that some jurors may believe "intentionally, and some wantonly." Appellant claims that in this form he is deprived of his right to a unanimous verdict as guaranteed by Section 7 of the Kentucky Constitution and his right to due process of law as guaranteed by the United States Constitution.

We disagree. In *Wells v. Commonwealth*, Ky., 561 S.W.2d 85 (1978), we held that the defendant could be convicted of first-degree assault under an instruction covering both theories, acting "intentionally" or "wantonly;" that he was not thus deprived of a unanimous verdict. The decision in *Wells* is directly in point and controls this case.

Under either theory, "intentional" or "wanton," "murder is a capital offense." KRS 507.020(2). The argument that this form violates the unanimous verdict requirement is only viable in the case where one theory is not supported by the evidence; that is, where the instructions erroneously include alternative mental states, for one of which there is no evidence to support the finding. *Hayes v. Commonwealth*, Ky., 625 S.W.2d 583 (1981). In the present case there was evidence from which the jurors could infer both an intentional act and wanton murder. The judge properly instructed the jury in this respect.

■ Appellant cites *Carter v. Kentucky*, 450 U.S. 288, 101 S.Ct. 1112, 67 L.Ed.2d 241 (1981), for the proposition that

a trial judge in a criminal case must instruct the jury that the defendant has a right not to testify and no adverse inference shall be drawn from his failure to do so. In this case there was no request for such an instruction. We disagree that the trial judge should have instructed the jury *sua sponte*. It is a matter of judgment for defense counsel to decide whether such an instruction is more harmful than beneficial. Counsel may decide it merely calls attention to the problem. We adhere to the requirement that such an instruction shall be given when requested.

■ Next, in the sentencing phase, the appellant complains that the instructions are erroneous in submitting first-degree burglary as an aggravating circumstance, because first-degree burglary is a Class B felony (KRS 511.020) and a child cannot be tried as an adult for a Class B felony (KRS 208.170(1)). We disagree. KRS 532.-025(2)(a) Section 2 specifies as an aggravating circumstance that the offense of murder was committed "while the offender was engaged in the commission of ... burglary in the first degree." The fact that the person charged is under a legal disability by reason of age which prevents his being convicted of an offense in no way suggests that the offense has not been committed, or that if the child did in fact commit the offense, it cannot be proved as an aggravating circumstance in conviction of another offense for which he can be tried, convicted and punished as an adult. The jury must find proof of the facts constituting the aggravating factor beyond a reasonable doubt before recommending the death penalty.

The Juvenile Code, KRS Chapter 208, mandates that a child may be adjudicated and punished for the offense of burglary in the first degree only in Juvenile Court, but it nowhere suggests that the fact of burglary in the first degree cannot be used as an aggravating factor to fix the death penalty against a juvenile who has been properly transferred to circuit court for trial. KRS 532.025, in listing "aggravating cir-

cumstances," makes no such distinction. Nothing in the statute in this respect conflicts with either the Kentucky Constitution or the Federal Constitution. There is no legal reason for refusing to give effect to the plain meaning of the words in the statute.

■ Appellant contends that the jury should have been instructed that it must find beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating circumstances. *Smith v. Commonwealth*, Ky., 599 S.W.2d 900 (1980), holds otherwise and explains why.

Appellant contends for both a directed verdict of not guilty by reason of insanity and, failing that, an instruction to the jury explaining the effect of a jury verdict of not guilty by reason of insanity.

■ In Kentucky, we adhere to the rule that insanity is a defense available to the defendant "in exculpation of criminal conduct (KRS 504.020(3))." KRS 500.070(3) provides that the defendant "has the burden of proving" those elements of the case "in exculpation of his conduct." We have held that "the introduction of proof of insanity by defendant does not place a burden on the Commonwealth to prove him sane;" rather, it entitles the defendant to an instruction to the jury that they may find him not guilty by reason of insanity and thus properly makes the issue of insanity a matter for the jury's determination. *Edwards v. Commonwealth*, Ky., 554 S.W.2d 380 (1977). And we have further held that "where there is any evidence indicative of sanity, a jury issue is presented." *Hayes v. Commonwealth*, Ky., 625 S.W.2d 583 (1981). Here there was lay testimony to rebut the defendant's proof of insanity albeit the question of whether a sufficient foundation was laid to express these opinions is arguable. Further, the circumstances preceding the commission of the crime, the evidence regarding the circumstances surrounding its occurrence, and the activities of the accused thereafter (which, arguably, suggest an effort to create an alibi), when taken as a whole were sufficient to submit the issue of insanity to the jury. It would not be clearly unreasonable for a jury to find against the defendant on the issue of insanity, regardless of the fact that all of the expert testimony was to the contrary.

The appellant concedes that in *Davis v. United States*, 160 U.S. 469, 16 S.Ct. 353, 40 L.Ed. 499 (1895), and *Leland v. Oregon*, 343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed. 1302 (1951), while putting the burden on the prosecution to affirmatively prove sanity in criminal cases in federal court, the United States Supreme Court respects the right of states to mandate otherwise. Our legislature has chosen to do so. We respectfully decline appellant's invitation to go one step further than the United States Supreme Court requires, declare KRS 504.020(3) unconstitutional and put the burden on the Commonwealth to prove sanity. Indeed, it is difficult to imagine circumstances in which a jury could conscientiously find any person who commits murder sane beyond a reasonable doubt. To demand that they do so is the kind of absurdity that puts the law in conflict with common sense and causes the public to question the system. The recent celebrated case involving the attempted assassination of President Reagan, *United States v. Hinckley*, 672 F.2d 115 (D.C.Cir.1982), is a prime example of the consequences of the federal rule which we here reject.

■ Further, we agree with the decision of the trial court refusing to instruct the jury on the consequences of a not guilty by reason of insanity verdict. *Edwards v. Commonwealth*, Ky., 554 S.W.2d 380 (1977). Before the jury was instructed, the appellant moved that *if* the prosecutor argued to the jury the effects of a not guilty by reason of insanity verdict, such as that Todd Ice would be set free, *then* "the jury be instructed on the full law regarding the issue of insanity." Presumably, this would mean covering all of the sections of KRS Chapter 202 related to possible dispositions of persons with mental disease or defect. As we have already stated, in *Payne v. Commonwealth*, Ky., 623 S.W.2d 867 (1981), we held that "Nei-

ther prosecutor, defense counsel nor the court may make any comment on the consequences of a not guilty by reason of insanity verdict at any time during a criminal trial .... (Such) external considerations have no legitimate bearing on the jury's factual determination of guilt or innocence."

Appellant complains that whereas such may be the general rule, this court should adopt a different rule where the prosecutor comments, as he did here, on the effect of a verdict of not guilty by reason of insanity. The prosecutor said:

"Now, if you're going to turn everybody loose that comes in and says I'm crazy, like Dr. Noelker said, I was under stress and had a psychotic episode, then what's the country coming to? Think about that. As you deliberate, think about that."

The answer to the appellant's dilemma is that such an argument should not have been permitted in the first place.

## III. CONSTITUTIONALITY OF THE DEATH PENALTY

Appellant's counsel has devoted a great deal of time, voluminous briefs and arguments, to the constitutionality of this Commonwealth's death penalty law in general and its constitutionality in respect to a juvenile in particular. Appellant argues the death penalty violates federal and state constitutional protection against inflicting "cruel and unusual punishment." United States Constitution, Amendment 8; Kentucky Constitution, Article 17.

We have discussed the constitutionality of the death penalty statute in this state repeatedly and recently. *Gall v. Commonwealth,* Ky., 607 S.W.2d 97 (1980). The Kentucky statute is modeled after the Georgia statute, which has been declared constitutional in *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976).

As such, it passes muster as being neither arbitrary nor capricious. As we said in *Gall,* at p. 113:

"The fight over capital punishment belongs in the political arena, where the will of the public can best be ascertained and expressed. It should not be resolved by judicial policy or by the exercise of raw judicial power."

In another, and perhaps deeper sense, this factor is thus expressed by Justice Oliver Wendell Holmes:

"As law embodies beliefs that have triumphed in the battle of ideas and then have translated themselves into action, while there still is doubt, while opposite convictions still keep a battle-front against each other, the time for law has not come; the notion destined to prevail is not yet entitled to the field." Holmes, *Law and Order,* in Collected Legal Papers, 294–295 (1920).

We have recognized the crime of robbery in the first degree as an appropriate aggravating circumstance.[4] There is no reason for making a distinction between robbery in the first degree as an aggravating circumstance and burglary in the first degree as an aggravating circumstance.

Appellant has argued against the constitutionality of the death penalty with particular emphasis as it applies to juveniles, citing three sources: (1) Briefs filed in behalf of a juvenile faced with the death penalty in *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); (2) Our decision in *Workman v. Commonwealth,* Ky., 429 S.W.2d 374 (1968); and (3) A section of Kentucky's proposed new "Unified Juvenile Code," KRS 208F.040(1), enacted in 1980, present effective date July 1, 1984, which will prohibit inflicting the death penalty upon a juvenile if it ever becomes law.

---

4. *Hudson v. Commonwealth,* Ky., 597 S.W.2d 610 (1980); *Self v. Commonwealth,* Ky., 550 S.W.2d 509 (1977); *Lenston v. Commonwealth,* Ky., 497 S.W.2d 561 (1973); *Galbreath v. Commonwealth,* Ky., 492 S.W.2d 882 (1973); *Caine v. Commonwealth,* Ky., 491 S.W.2d 824 (1973); *Call v. Commonwealth,* Ky., 482 S.W.2d 770 (1972); and *Leigh v. Commonwealth,* Ky., 481 S.W.2d 75 (1972).

■ There is no question but that Todd Ice's young age at the time of the offense is an important factor in his case that should have been given serious consideration at both the transfer hearing in juvenile court and as a mitigating circumstance at the sentencing phase in circuit court. But it is not a constitutional distinction. The United States Supreme Court has not yet decided that juvenile status puts the death penalty in conflict with the Eighth Amendment. In *Eddings v. Oklahoma, supra,* it was confronted with the question, but decided the case on other grounds. The *Eddings* decision reviews an Oklahoma case, *Eddings v. State,* 616 P.2d 1159 (Okl.1980), in which the Oklahoma Supreme Court rejected the argument that a sentence of death imposed on a sixteen-year-old murderer was unconstitutional because of his youth. The Oklahoma court considered at length both previous United States Supreme Court and state court cases and found the same arguments that have been presented to us to be without support. The Oklahoma court rejected the argument that the underlying philosophy of the state's juvenile code barred the use of the death penalty against a juvenile, stating at p. 1165–1166: "There was always a realization that all juveniles could not be helped ...." Recently, Arizona in *State v. Valencia,* 124 Ariz. 139, 602 P.2d 807 (1979), and Ohio in *State v. Harris,* 48 Ohio St.2d 351, 359 N.E.2d 67 (1976), vacated on other grounds subnom. *Harris v. Ohio,* 438 U.S. 911, 98 S.Ct. 3148, 57 L.Ed.2d 1155 (1978), has reached the same result.

Death as a punishment is no different, in and of itself, for a juvenile or an adult. The fundamental problem is at the other end, when should a juvenile be punished the same as an adult? This is a question for the legislature. At the present time, under the statutes now in effect, the decision is addressed to the discretion of the District Court Judge in Juvenile Session, using the criteria specified in the statutes.

Since we have reversed this case for the reasons previously given, we will not discuss the other points raised by appellant inasmuch as they are unlikely to recur on retrial of this case. Nothing in this opinion, however, shall be construed to foreclose a subsequent motion for change of venue, if filed.

The judgment of the lower court is reversed and this cause is remanded to the circuit court for a new trial.

STEPHENS, C.J., and GANT, LEIBSON and VANCE, JJ., concur.

AKER, J., files a separate concurring opinion.

LEIBSON, J., files a separate concurring opinion in which STEPHENS, C.J., joins.

STEPHENSON and WINTERSHEIMER, JJ., dissent.

STEPHENSON, J., files a dissenting opinion in which WINTERSHEIMER, J., joins.

AKER, Justice, concurring.

I concur in the majority opinion insofar as it reverses for a new trial because of the erroneous admission of polygraph evidence, and insofar as it remands this case to circuit court for retrial as an adult.

LEIBSON, Justice, concurring.

I concur in the majority opinion as written, but there are further errors that should be addressed.

## I. TRANSFER FROM JUVENILE COURT

The District Court acted within its discretion in transferring Ice to the Circuit Court for trial, but committed prejudicial error in the manner in which it conducted the proceedings.

The principal error occurred the morning of January 19, 1979 in the office of the Powell County Commonwealth Attorney. While Ice's case was pending in Juvenile Court the District Judge met with the Commonwealth Attorney and a Kentucky State Police detective who was investigating the case, and discussed the case at great length, "two or three hours or maybe long-

er." The three discussed the entire case, including all evidence collected, statements and interviews conducted to that point in time.

The fact of the *ex parte* discussion surfaced during the trial and was discussed on motion for a new trial. At that point the Commonwealth Attorney did not deny the discussion, but only presented an unsatisfactory explanation to the effect that the focus of the discussion was on Norvin Mayberry. This comment is in direct conflict with the sworn testimony of the State Police detective which indicated much more. In any event, Mayberry's involvement was an integral part of the Ice case and should not have been discussed *ex parte*.

In the first place neither the judge nor the Commonwealth should ever have participated in such a conversation. The trial judge should insist that neither the prosecutor nor the defense counsel nor any other person discuss a pending case with the judge *ex parte*. In such circumstances prejudice must be presumed. In the second place after participating in such a conversation the judge was obliged to recuse himself. KRS 26A.015(2)(b) mandates that a judge recuse himself when he has "personal knowledge of disputed evidentiary facts concerning the proceedings." This relates directly and particularly to an *ex parte* proceeding such as took place here. For this reason alone this case should be remanded all the way back to the first stage, the petition pending in Juvenile Court, to proceed once more from that point forward.

Next defense counsel complained that the Juvenile Court judge erred in permitting Ice's attorney to waive his presence during the KRS 280.170 procedure to consider whether to transfer Ice to Circuit Court. KRS 208, "Juvenile Proceedings: Commitment in Care of Children," reflects a policy in favor of non-criminal treatment of children. Transfer for trial as an adult is the exception, not the rule. In the circumstances of this case, where the child had been committed for psychiatric evaluation and the testimony and reports before

the juvenile judge indicated he suffered from serious mental illness, a judge should make every effort to personally observe the child. If circumstances make his presence in the County difficult or impossible, the judge should consider conducting the hearing in part at the facility where the child is being held. He should see and evaluate the child before making a decision.

KRS 208.140 provides for background investigation of the child before the case is disposed of in Juvenile Court. The kind of investigation required by that section was not performed in this case. The statute requires that "the investigation shall be conducted by volunteer or salaried probation officers of the Juvenile Court or by a suitable public or private agency." No such investigation was undertaken. The type of testimony that was taken at the juvenile transfer hearing from police officers was not a substitute for the investigation and report required by the statute.

## II. CHANGE OF VENUE

After Ice was transferred, indicted and arraigned in Powell Circuit Court, his counsel moved for a change of venue. The trial court's order granting the change recites that "the Commonwealth's Attorney then stated that he had doubts a jury could be obtained in Powell to try the case and waived all formalities and presentation of the written motion and affidavit," agreeing to the motion. Over defense objection, the judge then transferred the case to Wolfe County, an adjoining county in the 39th Judicial District. Thus the trial was held at Campton in Wolfe County rather than at Stanton in Powell County. So far as this case is concerned, the difference lacks substance. The Knox and Ice families lived just off Ky. 15 on the road between Campton and Stanton at a place not far from the county line. The uncontroverted affidavit of defense counsel filed at the time states that "the same state of feeling against the defendant inferentially exists in Wolfe County as it does in Powell County." The two areas are in fact not only adjacent, but part of an integrated rural community.

The circumstances that would make Powell unsuitable (which the Commonwealth conceded) would not change. The line between Wolfe and Powell County is an imaginary one drawn on a map and a distinction without a difference insofar as this case is concerned.

The constitution requires that a change of venue "be made to the most convenient county in which a fair trial can be obtained." Kentucky Constitution § 11. A right so basic as to address the attention of the framers of the constitution must not be facilely disregarded. In a case where change of venue was so obviously necessary that the Commonwealth conceded it, keeping faith with the concept of fair trial required more than lip service. The same problems of publicity and emotion that motivated defense counsel's request for a change of venue "far enough removed from Powell County, Kentucky, so as to enable the defendant to be free from prejudice or pressures levied upon him and upon the possibility of a fair trial," existed in Wolfe County. The defendant's objections were well taken and should have been honored.

Voir dire revealed that almost every juror was familiar with the case. Sixteen were excused because of fixed opinions and two others on account of involvement with the victim's family. The trial judge's report notes that publicity was extensive. Indeed Ice was initially moved to Fayette County because of fears for his safety. The defense counsel, his witnesses, and even a person excused from the jury were subject to threats, intimidation and harassment during the trial. A trial should never have taken place in such an atmosphere.

In *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), the United States Supreme Court stated at p. 363, 86 S.Ct. at p. 1522:

> "Where there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, the judge should continue the case until the threat abates, or transfer it to another county not so permeated with publicity."

Sheppard's conviction was reversed.

So also, in *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), a case remarkably similar to the present one, the United States Supreme Court reversed a conviction for failure to grant a change of venue.

In *Irvin* the defendant, indicted for murder, was granted a change of venue to an adjoining county, but denied a second change of venue and a continuance, sought on the ground of local prejudice. He was convicted and sentenced to death. The Supreme Court reversed and remanded expressing the unanimous opinion that he was denied due process of law under the Fourteenth Amendment because the jury in the state trial was not impartial. The fact that it is ultimately possible to seat a jury of citizens whose answers on voir dire do not show they were knowingly or intentionally biased does not deal with the problem nor cure the error.

In *Irvin* the court quotes the following observation by Chief Justice Hughes in an earlier case:

> "Impartiality is not a technical conception. It is a state of mind. For the ascertainment of this mental attitude of appropriate indifference, the Constitution lays down no particular tests and procedure is not chained to any ancient and artificial formula." 366 U.S. at 724–25, 81 S.Ct. at 1643–44.

The statutes related to change of venue in a criminal action, KRS 452.210–452.350, incorporate the letter and the spirit of the Kentucky constitutional article on change of venue and the U.S. constitutional amendment on due process of law. The Commonwealth is in error in quoting KRS 452.240 ("not more than one change of venue … in the same criminal or penal action") as foreclosing a subsequent change of venue from Wolfe County, because the defense had objected to Wolfe County in the first place. This objection was never waived. The order overruling that objection is interlocutory in nature and subject to further change as with other interlocutory orders. We

should direct transfer of the case to a place sufficiently separated by both distance and character that "a fair trial can be had."

## III. JURY SELECTION

The trial court failed to follow the directions of KRS 29A.070, "Juror Qualification Forms." KRS 29A.070(1) mandates that "a jury qualification form accompanied by instructions to fill out and return the form by mail or hand delivery to the clerk" be delivered with a summons to each juror. The statute mandates procedures to insure that the forms are completed and returned. Finally, the statute mandates that if the judge does disqualify a juror, he shall record the reason on the qualification form and that such forms (with certain exceptions) "shall be made available to parties or their attorneys." The painstaking efforts of the legislature to bring about reforms in the methods of jury selection in order to insure a fair and impartial jury and to meet the requirements of due process cannot be circumvented, as they are by anything less than substantial compliance with the statutory mandates. In this case jurors were permitted to refuse to fill out the forms and released by telephone for reasons which would not appear on forms that were not completed. Defense counsel was thus deprived of any opportunity to check on whether jurors were properly excused. Failure to substantially comply with the mandated procedures was erroneous.

## IV. OTHER TRIAL ERRORS

In rebuttal to appellant's evidence supporting the defense of insanity, the Commonwealth called two police officers who had contact with the appellant at different times after the occurrence. These police officers testified that in their opinion Ice appeared "normal." One went further. Over objection the prosecutor was permitted to ask this witness whether in his work "with the Kentucky State Police" he had "developed some expertise" in judging insanity, and after an affirmative response was permitted to express an opinion that Todd Ice was not insane.

In this jurisdiction a nonexpert witness may give an opinion as to the mental condition of another after an appropriate foundation has been laid by showing of facts "evincing a familiarity" with the accused [*Graham v. Commonwealth*, Ky., 420 S.W.2d 575 (1967)] or acquaintanceship with the accused [*Feree v. Commonwealth*, 193 Ky. 347, 236 S.W. 246 (1922)]. In short, we adopted the rule found in 3 *Wharton's Criminal Evidence*, § 609 (1973):

"A lay witness may state his opinion of a person's mental condition if it is shown that he was acquainted with the person in question so intimately and for such a length of time as to be able to make an informed judgment."

But the facts establishing a foundation for a lay witness relate to acquaintanceship with the accused and are not bolstered by some supposed expertise on the subject of insanity based on experience as a police officer. As a general rule experience as a police officer no more qualifies the witness to express an opinion regarding insanity than it qualifies a police officer to express an opinion regarding who is at fault in an accident. *North American Accident Ins. Co. v. McAlister*, 290 Ky. 88, 160 S.W.2d 385 (1942); *Service Lines, Inc. v. Mitchell*, Ky., 419 S.W.2d 525 (1967). The testimony as to police expertise on mental condition was improper.

The prosecutor was permitted to adduce evidence and comment in closing on Ice refusing to answer questions post arrest, thus violating his "Miranda Rights," and on his failure to testify at trial violating the mandates of *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), *Green v. Commonwealth*, Ky., 488 S.W.2d 339 (1972), and KRS 421.225. On the next trial the prosecutor should steer clear of questions or comments that impose on these rights.

STEPHENS, C.J., joins in this concurring opinion.

STEPHENSON, Justice, dissenting.

I dissent from the majority opinion at the same time recognizing the seriousness of the question raised by the polygraph evidence.

The questioning of a minister as to a biblical basis for the death penalty was in response to Ice's introduction of testimony by a minister that the *Bible* taught that the death penalty was wrong. This seems eminently reasonable to me, Ice opened the door on this subject.

The opinion here unfairly characterizes the closing argument as prosecutorial misconduct. What is wrong with asking the jury that Ice not be "turned loose to kill again"? This does not violate *Payne* (which I believe should be overruled) as it does not address the consequence of a verdict. Insofar as the criminal justice system is concerned, a not guilty verdict "turns him loose."

As to the polygraph evidence, I agree that it was error to admit that testimony. It was irrelevant. It was never an issue, only a smoke screen. Insanity was the defense from the beginning. The testimony of Ice's psychiatrist that he had no recollection of events, that he could not bear to remember what he had done etc., clearly shows there was no pretense that anyone other than Ice did the killing.

Had Ice taken the stand and testified he did not do the killing or that Mayberry did, then the polygraph evidence would have been relevant and reversible error. Here it was irrelevant and did not prejudice Ice's defense.

I would affirm the conviction and accordingly dissent.

WINTERSHEIMER, J., joins in this dissent.